## MARY MASSMANN v. GREAT NORTHERN RAILWAY COMPANY.[1]

December 23, 1938.

No. 31,855.

*A. L. Janes, J. H. Mulally,* and *Atwood & Quinlivan,* for appellant. *Peter Ahles,* for respondent.

[1]Reported in 282 N. W. 815.

Loring, Justice.

In an action to recover for the death of Henry Massmann, who was killed at a grade crossing one-half mile west of the village of Waite Park, Stearns county, on August 17, 1937, the plaintiff had a verdict, and the defendant has appealed from an order denying its motion for judgment or a new trial.

The highway which crosses defendant's track at the point where Massmann was killed runs north and south, is graded but not paved or graveled. It intersects the single track of the main line of the Great Northern Railway at approximately right angles. Massmann was driving south at 35 or 40 miles an hour on this highway toward the crossing a little before noon August 17, 1937. The eyewitnesses say that he did not slacken speed until he was struck by the defendant's eastbound passenger train, which was traveling about 55 miles an hour and had its bell ringing automatically from a point at least half a mile west of the crossing. The whistle was sounded at the whistling post a quarter of a mile from the crossing and was blown at intervals until the train was over the crossing. For about 100 feet north from the railroad track the highway slopes gently down to a point about two and a half feet below the level of the rails at the crossing. From that point north there is a gradual rise for about 300 feet to a point practically level with the crossing. North of that again the road slopes down for about 600 feet to a point six feet lower than the level of the crossing. Seventy-eight feet north of the railroad track and a like distance west of the highway stands a small house with some outbuildings to the west of it. The house faces east toward the highway, and the porch was on that side. There was a snow fence along the north side of the railroad track commencing about 47 feet west of the highway. The house and fence constitute the only obstructions to the view as a driver approaches the crossing from the north. This snow fence was approximately six feet high and was constructed of horizontal boards four to six inches wide placed about four inches apart. The engine and cars of the train which struck Massmann stood about 15 feet above the track and were plainly visible above the snow fence when the train was within 250 or 300 feet of the

crossing and Massmann 100 feet therefrom. Except for the house and fence, there was also a clear view from the highway of the track and the grade on which it lay and of the telegraph and telephone poles for a considerable distance to the west. A few feet east of the crossing on the south side of the railroad track was a railroad crossing sign of the triangular type used by the Great Northern Railway. It was painted white with black letters reading, "RAILROAD CROSSING." The rails of the track itself could be seen for more than 100 feet as the driver approached the crossing from the north. The only eyewitnesses to the collision were the fireman of the train and a girl 12 years of age named Ruth Gohman, who lived in the house near the crossing. Ruth was on the front porch of the house as the train approached, and she saw the Massmann car as it passed on the road going toward the crossing and said that it was going fast and that when it went upon the crossing, "There was a crash and dust and smoke." The fireman saw the Massmann car when it was about 400 feet from the crossing and the engine was about 600 feet from it. He estimated the speed of the car at 35 to 40 miles an hour, and he watched it except for the time when it was behind the Gohman house. When it came out from behind the house he shouted to the engineer because he thought the car was not going to stop. The car kept right on going straight across the crossing and had got about two-thirds of the way across before it was hit. It was carried about a quarter of a mile on the pilot of the engine.

There was evidence that the planks on the crossing were loose, and the center plank was picked up by the engine and carried to the point where the train was brought to a stop.

The plaintiff contends that there was negligence on the part of the defendant company in two respects: First, that it did not erect adequate warning signals of the presence of the railroad crossing; and, second, that the condition of the planks on the crossing impeded the passage of the car and retarded it so that the engine struck it.

■ During the trial of the case the opinion of this court in Licha v. N. P. Ry. Co. 201 Minn. 427, 276 N. W. 813, was handed

down, and the plaintiff, who had at that time rested her case, was allowed to reopen it and present additional testimony in an endeavor to show that the crossing was an extra-hazardous one requiring more protection than that offered by the statutory crossing sign erected some years before by the railroad company. The Licha case reversed Olson v. C. G. W. R. Co. 193 Minn. 533, 259 N. W. 70, which took the position that L. 1925, c. 336, constituted a complete code of regulations superseding and including all law in existence at the time of its adoption relating to warning signals at railroad crossings, and that compliance therewith freed the railroads from any further obligation to protect the crossings by any signals or signs in addition to those prescribed under the code. This court in the Licha case concluded that the legislature did not intend by c. 336 so to provide. It concluded, as do the majority of the courts in this country, that if ordinary care requires more than was required under the code that liability would follow if a failure to exercise ordinary care was a proximate cause of injury. In general principle, the Licha case did not change the law from what it had been prior to the Olson case; what it did do was to change the previous holdings of this court as to the presence of cars across a highway crossing being under all circumstances an adequate notice of the presence of a train, a holding which was apparently unnecessary to the conclusion arrived at in Crosby v. G. N. Ry. Co. 187 Minn. 263, 245 N. W. 31, or in Ausen v. M. St. P. & S. S. M. Ry. Co. 193 Minn. 316, 258 N. W. 511, since in those cases there were adequate warning signs. In short, the Licha case applies the principle of ordinary care to all crossings and to all situations relating thereto and holds that the statutory requirements are the minimum duty of the railway company; that ordinary care may require more than the statute and that under special circumstances the mere presence on the crossing of standing or moving unlighted cars such as freight cars may not be adequate warning of the obstruction of the highway. From the foregoing it will be seen that the principles laid down in the Licha case have no application to the case at bar except as the Licha case restores the rule as it prevailed prior to the Olson case. If in the case before us the warning sign erected by the railroad

company was under the circumstances of this case adequate warning to Massmann, approaching as he did in the broad light of a clear day, then the railroad company as to him was not at fault in not erecting further warning. As we look at the evidence presented by the record the whole situation announced a warning to Massmann of the existence of the crossing. In the broad light of high noon the large black letters on the white boards could hardly be missed by the most indifferent of observers. The very presence of the snow fence, which was in plain view both to the right and to the left, constituted a further warning because it was a fence of the peculiar character used only by railroads for protection against snow. This was a matter of such common knowledge that courts will take judicial notice of it. The two rows of telephone and telegraph posts together with the snow fence and warning sign would have admonished a traveler of ordinary prudence that he was approaching a railroad, even if the rails themselves had not been visible as they were from the highway from a point far enough back from the crossing to permit the easy stopping of the car. It must be remembered that we are not here discussing the adequacy of signs to warn a traveler at night, nor have we a case where adequate signals of the train's approach were not given. There is no contention here that signs or signals should have been erected which would have given greater warning of the approach of trains as distinguished from warnings of the existence of the crossing. As a matter of law we see no lack of care on the part of the railroad company toward travelers approaching this crossing in the daytime.

■ The respondent earnestly contends that the circumstantial evidence justified the jury in finding that the loose planks upon the crossing caused them to obstruct and retard the passage of the Massmann car sufficiently to prevent its clearing the crossing ahead of the train. The argument is ingenious, but as we read the record it rests entirely in speculation and conjecture. The crossing planks used at this crossing were 16 feet long, ten inches wide, and four inches thick. There were five of them between the rails, which left very little, if any, space between them. There was one plank outside of each rail. The height of the rails was seven inches. This

necessitated a three-inch shim under the crossing planks to bring them up to the level of the tops of the rails. The ends of the crossing planks extended 18 inches beyond the nearest shim. When the locomotive struck the automobile the point or nose of the pilot was bent down so that it could not clear a crossover, a guard rail or a crossing plank. It was several inches below the ball of the rail. After the train was stopped it was necessary to remove the pilot with an acetylene torch before the train could proceed.

The center plank at the highway crossing was picked up in some manner by the locomotive. The defendant contends that it was picked up by the pressure of the bent nose of the pilot, which when it reached the eastern end of the center plank had a tendency to throw up the western end on the easternmost shim as a fulcrum. It is defendant's claim, and witnesses testified, that the crossing plank was found lodged under the engine with the western end extending back as far as the ashpan and the eastern end near the front driving wheels. The plank was wedged in the gear that held the brake on the front drivers. One of the defendant's witnesses testified that he went under the engine for the purpose of getting the plank and found it so wedged in that he had to saw off about six feet from one end in order to remove the plank. He said it was lying with its broad side in a horizontal position and that there was a marked or gouged place upon the plank that ran toward the easterly end of it as if the pilot's nose had struck it there. On October 3 one of plaintiff's witnesses found an engine pilot on the right of way about a half mile east of the crossing, and an old crossing plank 16 feet long on the opposite side of the track. The pilot had a hole between the upright pipes which at its widest point was six and a half inches across. This hole was at about the second opening to the right of the center of the pilot. The pipes which formed the sloping part of the pilot were about three or three and a half inches apart so it is obvious that if the four-inch plank, which was 10 inches wide, were to pass through the pilot the broad side of the plank must have turned to a vertical position. Our attention has been called to nothing in the record which identifies either the pilot or the plank as the ones involved in the accident. The pilot

was found immediately opposite to Great Northern shops at Waite Park. Even if we assume that the pilot was the one that had been cut off from the engine here involved and the plank was the center plank of the crossing, we are still in the realm of conjecture as to whether the looseness of the plank had any connection with the cause of Massmann's death. Several witnesses testified that they had crossed the highway crossing that forenoon, one of them only 15 minutes prior to the accident, and that he had seen no defects in the planking. Some days after the accident some of the plaintiff's witnesses found that some of the planks upon the crossing which were undisturbed by the accident were loose and that one end could be lifted up. From this circumstance the plaintiff contends that the jury was justified in concluding that the front wheels of the Massmann car tipped up the center plank so that it caught in the rear wheels of his car and retarded its movement across the crossing so much that the car was held there until the engine struck it. Obviously this theory piles speculation upon speculation and conjecture upon conjecture. The first conjecture is that, contrary to the testimony of the eyewitnesses, the car was retarded in its passage, then that the stopping or slowing up was due to a loose plank, then that the western end of the loose plank tipped up. Then follows the conjecture that the plank must have turned in being raised so that the broad side of it was vertical so as to pass the four-inch plank through the three-and-one-half-inch upright space between the pipes of the pilot. We need not go further. There is no testimony, whatever, that the movement of the car was retarded, and thus the basis for all of plaintiff's ingenious conjectures does not exist. There is no evidence that the car crossed so near the east end of the plank as to be likely to cause the west end to be lifted up. Where the car passed over the crossing planks lies in conjecture. If the car crossed with all four wheels on the planks, the weight on the right-hand wheels would counterbalance the weight of the left-hand ones even if the left ones were east of the shim.

██ What we have said before shows that as a matter of law Massmann was guilty of contributory negligence.

The order denying defendant's motion for judgment must be reversed with directions to enter judgment for the defendant notwithstanding the verdict.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.