# IRVING SULLIVAN v. E. E. BOONE AND OTHERS.
## RICHARD COSSI v. SAME.
## DULUTH, WINNIPEG & PACIFIC RAILWAY COMPANY, RESPONDENT.[1]

June 16, 1939.

Nos. 31,926, 31,927.

[1]Reported in 286 N. W. 350.

*I. R. Galob* and *Austin & Wangensteen,* for appellants.
*Gillette, Nye, Harries & Montague,* for respondent.

STONE, JUSTICE.

Consolidated for trial, this pair of actions for the deaths of Shirley Cossi and Kenneth Sullivan resulted in verdicts against defendant railroad and for defendants Boone. From orders for judgments notwithstanding the verdicts, plaintiffs appeal.

The cases arose from a railroad crossing collision. Defendant Wiley Boone, with the two decedents and Miss Helen Tomar as passengers, was driving east from Chisholm to Eveleth. The train was going north, bound for Virginia. The collision took place at 2:25 a. m. of March 16, 1937.

The night was cold and dark, but clear. There were yellow and black disc "Railroad" signs about 300 feet from the crossing on each side. The post of the one on the west was somewhat buried in a snowbank, over and against the background of which the disc stood out in prominence except that some portion of it nearer the road had been bent backward by the highway snowplows. There was a reflector sign 150 feet west of the crossing, but it was temporarily out of commission, broken and turned so that it faced due north rather than west and toward eastbound traffic. It is said to have been so damaged by the snowplows. In keeping the 20-foot concrete highway clear, they had piled the snow in windrows, flanking the pavement on both sides, from three to four and one-half feet high. Close to the rails, one on each side, were tall cross-arm, or "sawbuck," crossing signs. Their posts were striped diagonally with bars of black and white paint.

The crossing is in an area of second-growth timber, averaging 25 to 30 feet in height. But the highway right of way was clear. So also that of the railroad. All trees and brush had been cut from the angles of the intersection back far enough so that there was nothing of the "blind" about the crossing, save that it was in a

relatively flat area. East of the railroad was no timber for over 400 feet. Both highway and railroad were on the usual low "fills" or embankments. Anyone approaching on the road, if even slightly attentive, could not have avoided timely warning of a train on or anywhere near the crossing.

One hundred feet west there was, from the highway, a clear view from 600 to 700 feet south along the railroad. From 200 feet west there was similar visibility south for from 300 to 400 feet.

Some light may be thrown upon the cause of the tragedy by the fact that the four young people involved, although innocently, had been making a night of it. All four were occupying the one seat in the enclosed cab of the truck. Boone was behind the wheel, Miss Tomar next to him, and on her right Sullivan, with Miss Cossi on his lap.

The trial judge, in his decision, stated:

"The freight train * * * consisted of 86 freight cars besides the engine and caboose. The last 38 cars of the train except the caboose were flatcars. The top of the flatcars was four and one-half feet above the top of the rails, and many of these flatcars were equipped with upright stakes extending several feet above the top of the flatcar, and many of them were birch stakes with birchbark upon them. The automobile ran into the nineteenth flatcar from the rear."

The trial judge also said rightly that "the great weight of the evidence is to the effect that the statutory signals [by bell and whistle] for the approach to the crossing were given." The railroad had complied with all the requirements of the railroad and warehouse commission in respect to warning signs. The commission had inspected the place and refused to make it a "stop" crossing.

■ In respect to statutory signals by bell and whistle, the statute, 2 Mason Minn. St. 1927, § 10263, reads thus:

"Every engineer, driving a locomotive on any railway, who shall fail to ring the bell or sound the whistle * * * at least eighty rods from any place where such railway crosses a traveled road

440

\* \* \* or to continue the ringing of such bell or sounding of such whistle at intervals until such locomotive and the train thereto attached shall have completely crossed such road \* \* \* shall be guilty of a misdemeanor."

We now assume, favorably to plaintiffs, that there was a jury question whether the signals were sounded before the locomotive reached the crossing. Such failure, if failure there was, plainly was not the proximate cause, or even one such cause, of the accident. The train was a good half mile long. The automobile struck the nineteenth car from the rear, so that the engine was then nearly half a mile past the crossing. The train was a heavy one. On the upgrade which it was ascending its speed did not exceed 16 miles per hour. Where so long a train has gotten so much of its length over a crossing only to have an automobile driven into its rear by a grossly negligent chauffeur, who admits a speed of 35 miles per hour at the moment, it is futile to argue that the failure to make use of the signals, assuming, contrary to convincing evidence, that there was such a failure, was a proximate cause.

The statute requires, anomalously for so long a train, the sounding of the signals until the entire train has passed over the crossing. In this case the engineer did not continue use of bell and whistle after the locomotive had cleared it. Here again, if there was negligence, the added factor of proximate causation is wanting. At the moment of impact the engine was about half a mile away to the north. Sounding bell and whistle so far away would have added nothing of warning to that furnished by the cars themselves as they moved across the highway directly in front of the occupants of the truck. In such a case, with the crossing in flat country and unconcealed, the rule still holds that the crossing itself, particularly if marked as this one was, with the moving train thereon, is enough of a warning. Crosby v. G. N. Ry. Co. 187 Minn. 263, 245 N. W. 31; Ausen v. M. St. P. & S. S. M. Ry. Co. 193 Minn. 316, 258 N. W. 511.

■ For plaintiffs reliance is upon the rule of Licha v. N. P. Ry. Co. 201 Minn. 427, 276 N. W. 813. (See also Munkel v. C. M. St. P. & P. R. Co. 202 Minn. 264, 278 N. W. 41.) While counsel may

not misconceive that rule, they are attempting an erroneous application of it. As emphasized in Massmann v. G. N. Ry. Co. 204 Minn. 170, 282 N. W. 815, the decision in 'the Licha case does nothing more than apply the rule of commensurate care to a railroad crossing. Where extra-hazardous conditions exist, it may not be enough to clear it of the charge of negligence that a railroad has complied with the rules of the railroad and warehouse commission in respect to warning signs. Those are the minimum requirements of law and due care. In the Munkel case there were special and decisive circumstances (smoke emitted by a standing locomotive with its headlight turned off), which prevent its present application.

There was nothing of the unusual or extra-hazardous about this crossing. For that reason we hold as matter of law that, having fulfilled the requirements of the commission in the installation of warning signs, there is no room for a finding that the railroad was negligent in not doing more.

It matters not that, as stressed for plaintiffs, this accident happened at night. The added hazards brought on by darkness with nothing more are not to be charged, in the form of adverse verdicts, against railroads. All crossings are built for both day and night use. With that in view, warning signs are designed and required by public authority. Whether others may be demanded by due care is a question to be answered, not from the standpoint of daylight and darkness, but from that of the physical characteristics of the crossing itself.

Notwithstanding the unexplainable verdicts that exonerated the driver of the truck, while holding the railroad company for substantial damages, we are constrained to hold that the former's negligence was the one cause of the tragedy which snuffed out the lives of two of his young companions.

For plaintiffs much is said concerning the supposedly "inconspicuous flatcar." Tacitly ignored is the fact that, instead of one car, there was a train *moving* across the line of forward vision of those in the truck. The latter's lights were shown to have com-

plied with the requirements of highway law. So that at 200 feet[2] the cars should have been plainly visible, in the rays of the headlights, to even an inattentive glance. The real attention to what lay ahead, which due care requires always of every chauffeur (see Dreyer v. Otter Tail Power Co. 205 Minn. 286, 285 N. W. 707) simply could not have failed to discover the train. The railroad has as much right to use its track as the autoist has upon the highway. The duties imposed by such use are reciprocal. The danger is great, and the care required of both railroad and autoist is commensurate thereto. But to hold in the case of a crossing presenting nothing of an extra-hazardous nature, without such special circumstances as those of the Licha and Munkel cases, that the railroad is at fault is to say that the entire duty of care should be upon the railroad and the autoist relieved entirely. To that extent we refuse to go, and, as we read the cases, none of them justify such a result.

The orders appealed from are affirmed.

Mr. Justice Hilton, being incapacitated by illness, took no part.

Mr. Justice Loring took no part.

---

[2]The present requirement for the "uppermost distribution of light, or composite beam" is that it must be "so aimed and of such intensity as to reveal persons and vehicles at a distance of at least 350 feet ahead." 3 Mason Minn. St. 1938 Supp. § 2720-246(a). That applies in the nighttime "upon a straight level unlighted highway under normal atmospheric conditions." *Id.* § 2720-234(b). The former demand, under L. 1927, c. 412, § 48(a), was for "sufficient light to render clearly discernible any person on the highway at a distance" of 200 feet.