CARL KRAUSE v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY AND ANOTHER.

AVITUS HIMSL v. SAME.

JOHN MARRINAN v. SAME.

EDWARD HOLLAND v. SAME.

FLORENCE CARLIN v. SAME.[1]

February 16, 1940.

Nos. 32,236 to 32,245, inc.

[1]Reported in 290 N. W. 294.

176

*Warren Newcome, Alfred F. Rietz, George T. Olsen,* and *William T. Faricy,* for appellants.

*Edwin C. Kraus* and *George T. Havel,* for respondents.

HOLT, JUSTICE.

About 12:30 a. m. on September 25, 1937, a still, dark night, a 1929 model A Ford coach, carrying six young men, drove into the nineteenth boxcar of a southbound freight train of defendant railway company as it was crossing trunk highway No. 99 at the depot across the river from St. Peter, Minnesota. Three of the young men were killed and two injured. A special administrator of the

estate of each of the three who met death was appointed and sued the railway company and the locomotive engineer in charge of the train for wrongful death. The two injured men, by the same attorneys, sued the same defendants to recover damages sustained in the collision. The five suits were tried together and separate verdicts for plaintiff in each case returned against both defendants. A motion was made by each defendant in each case for judgment notwithstanding the verdict or a new trial. From the orders denying the motions, defendants appeal separately.

The negligence charged against defendants is the same in each of the five cases. There are five printed pages of such alleged negligence, but it is not necessary here to enumerate the alleged commissions and omissions. It is sufficient to say that the proof was confined to showing (a) that the statute in respect to the sounding of the whistle and the ringing of the bell on the locomotive was violated; and (b) that the crossing was extra-hazardous and the railway company was negligent in not adequately protecting it by signs properly placed, gates, bells, automatic signals, or watchman. The conclusion reached by this court as to these appeals renders it unnecessary to consider the numerous errors assigned upon the admission or exclusion of evidence, misconduct of counsel, or errors in the instructions of the court, with the exception of those for directed verdicts.

It is plain that defendant Raddle cannot be charged with any alleged negligence causing this tragedy unless it be the failure to give the signals required by statute at railway grade crossings. It is to be noted that this crossing is not within the city limits of St. Peter, located on the west bank of the Minnesota River; but is on the east side of the river, in Le Sueur county. A bridge crosses the river, and this trunk highway leads easterly from the easterly end of the bridge 992 feet to the main track of the defendant railway. The 992 feet is a straight, black-surfaced, tarvia roadway 24 feet wide, crossed by the main line and two side tracks east thereof, at right angles. The freight train in question, approaching this trunk highway crossing from the north

and traveling about 25 miles an hour, consisted of 56 cars besides locomotive, tender, and caboose—2,600 feet in length over all. The engineer, fireman, and head brakeman, riding on the locomotive, all testified to whistling for the crossing, two long and two short whistles, the last about when the locomotive passed the crossing, and that the bell, operated by air, rang until Kasota, four miles south of the crossing, was reached. A young filling station attendant, who sold the driver of the Ford two quarts of oil just before the six young men started easterly over the bridge, also testified to hearing the whistle sounded for the crossing. Francis Holland, the driver and owner of the Ford, was instantly killed; so were Charles Carlin, seated next to him, and Jerome Krause, seated at the left in the rear seat. Vernon McGree, next to Krause, testified that he was asleep, and Avitus Himsl, to the right of McGree, was not certain that he was awake—he did not hear one of the men in the car call out "a train" a moment before the collision. So the only one of the six at all in a position to testify concerning whistle or bell is John Marrinan, seated to the right in the front seat. He testified that he heard neither whistle nor bell; but does not say he was listening for any sound. He said he was looking at the surface of the road, and he did not see the advance reflector railroad sign passed 453 feet from the crossing and about three feet from the edge of the tarvia on the southerly side of the road. He was seated in a crowded car—there being four individual seats only, holding six persons weighing from 160 to 190 pounds each. It was midnight on September 25, and the evidence fails to show whether any window of the Ford was open. Any car eight years of age running 35 miles an hour creates some noise. So does a railroad freight train. He did not say he heard the noise of the train before the impact. He also testified that as they drove from the bridge a discussion was going on concerning a certain play in the football game Holland, Krause, and he had come over from Lakeville to St. Peter to attend between Gustavus Adolphus College and St. John's College. McGree, Carlin, and Himsl were assistant coach and players of

St. John's College, and the other three were graduates or students of that college. The discussion related to a play made by St. John's team which the umpire called back, to the displeasure of the occupants of the Ford. It is submitted that in the situation of Marrinan his negative testimony that he did not hear whistle or bell is of no probative value as against the positive testimony of four witnesses in a position to hear that the whistle was sounded and the bell rung. No verdict should be allowed to stand finding negligence of the defendant Raddle, in that he violated 2 Mason Minn. St. 1927, § 10263, which enacts that:

"Every engineer, driving a locomotive on any railway, who shall fail to ring the bell or sound the whistle upon such locomotive * * * at least eighty rods from any place where such railway crosses a traveled road or street, on the same level (except in cities), or to continue the ringing of such bell or sounding of such whistle at intervals until such locomotive and the train thereto attached shall have completely crossed such road or street, shall be guilty of a misdemeanor."

In Crosby v. G. N. Ry. Co. 187 Minn. 263, 245 N. W. 31, it was held that this statute was not designed for the protection of motor vehicle passengers who run into a train lawfully occupying a grade crossing. This statute in the present form has existed in this state prior to the advent of motor vehicles. In the days of travel on foot or by ox or horse team there was no need of ringing bell or sounding whistle to protect against injury from a train moving over a grade crossing. In Everett v. G. N. Ry. Co. 100 Minn. 309, 111 N. W. 281, 9 L.R.A.(N.S.) 703, 10 Ann. Cas. 294, is a long discussion as to the applicability of this statute. However, even were it assumed that Raddle violated § 10263, such violation could not upon this record have been found a contributing proximate cause of the unfortunate accident. The conditions are similar to those present in Sullivan v. Boone, 205 Minn. 437, 286 N. W. 350, with the exception that there the railway car run into at the crossing by the motor vehicle was the nineteenth from

the rear of a moving, 86 empty flatcar freight train, whereas here it was the nineteenth boxcar from the tender and locomotive. It was there held, assuming a violation of § 10263 occurred, that such violation could not be found a contributory proximate cause of the accident there involved. We think the court erred in denying defendant Raddle's motions for directed verdicts and judgments notwithstanding the verdicts.

Was this an extra-hazardous crossing so that the defendant company in the exercise of due care was required to warn travelers on the highway of its trains passing thereon by other methods than those present on the night of September 25, 1937? It is a much traveled highway, an average of 306 motor vehicles passing over the crossing daily. However, it must be conceded that in daylight a moving freight train upon this crossing would in itself be an adequate warning. The highway runs in a straight line from the bridge east until several hundred feet past the crossing, which it traverses at right angles. For all that distance it is practically level. So is the railway's right of way. To one going east from the bridge there is no structure shutting off the view of a boxcar were it standing on the crossing. The location of the passenger depot and freight depot are unimportant at night for it does not appear whether either was lighted. Two engineers, one called by plaintiff, the other by defendant, practically agree as to the grade of the highway. Assuming a standard of 100 feet, the grade of the roadway from the east end of the bridge to the westerly rail of the main track is as follows: At the east end of the bridge, 992 feet west of the rail, 104 feet; 800 feet, 99.8 feet; 333 feet, 97.9 feet, apparently the lowest point; thence a gradual rise so that at 216 feet west of the rail the grade is 98.5 feet; at 132 feet, 98.4 feet; at 80 feet, 98.5 feet; at 40 feet, 98.9 feet; at 20 feet, 99.4 feet; at 10 feet, 99.6 feet; at top of west rail, 99.8 feet. It is thus seen that with proper headlights at nighttime a motor vehicle traveling toward this crossing, after getting within 333 feet thereof, would see more of a boxcar upon the crossing than if the highway were per-

fectly level. It is contended by plaintiffs that the black tarvia surface absorbs the rays of the motor headlights so as not to disclose a moving freight train upon the crossing; but it is submitted that such a train of cars of various colors blends more with a grayish pavement than with a black. It is perfectly plain that the grade of the highway in conjunction with the grade of that of the railway creates no unusual danger at this crossing. There was no evidence that either the "stop" sign or the saw-buck sign at this crossing were not those required by law to be maintained there. Nor was this crossing one which could be regarded as extra-hazardous either in daytime or at night because of obstructed view to travelers on the highway. The station or passenger depot and the freight depot were located west of the railway tracks. The former was 175 feet south of the highway and the latter 248 feet north. Between the two was no obstruction. The ground between the depots and the highway was level and without ditches. One going east on the highway from the bridge has a clear view of the railway track north for 300 feet when he arrives at a point 100 feet from the crossing, and when he comes to 62 feet from the crossing he has a clear view of the railway track north for a distance of 2,400 feet. The view of the track toward the south is for a longer distance than north at the points stated.

It appears that for some years prior to the enactment of L. 1925, c. 336 (1 Mason Minn. St. 1927, §§ 4743-1 to 4743-17, inclusive) the defendant railway had maintained at this crossing an electrically operated bell which started ringing when any car or locomotive came within a distance of 2,000 feet and kept ringing as long as they remained within that distance. But after that law went into effect the railroad and warehouse commission investigated the grade crossings of this railway; and, in November, 1925, ordered it to place and maintain "stop" signs at this crossing and take out the bell. The defendant railway complied with the order. Noncompliance would have subjected it to punishment (§ 4743-17). In addition to these signs maintained by the

defendant railway, pursuant to law and the order of the railroad and warehouse commission, warning of the approach to this grade crossing was also maintained by the highway commissioner, who has sole control of trunk highway signs by virtue of L. 1927, c. 412, § 56 (1 Mason Minn. St. 1927, § 2720-56); Murphy v. G. N. Ry. Co. 189 Minn. 109, 248 N. W. 715. This so-called advance railroad crossing sign was placed and maintained 453 feet west of the crossing and about three feet south of the south edge of the tarvia, and consisted of the letters "R. R." on the usual reflector sign. Also to be considered are red electric lights burning night and day on top of two switches, the one just west of the west rail of the main track and 15.8 feet north of the center line of the highway, and the other just east of the main track and 17 feet south of the said center line. The first one was visible to east-going traffic in the nighttime all the distance from the bridge to the crossing. The last mentioned, of course, was not visible to eastbound travelers when a passing train of cars was upon the crossing except as it would flash through the space between the ends of box- or gondola or tank cars. There was also an electric light of 250 watts suspended from a projecting arm of a 22-foot pole located close to the highway and 132 feet west of the crossing. Between this and the bridge was a similar electric light. It is contended for plaintiffs that this light 132 feet west of the crossing interfered with the headlights of motor vehicles approaching the crossing; but we think this contention was conclusively refuted.

Plaintiffs, to prove this an extra-hazardous crossing, offered evidence of a fatal accident in January, 1936, which was investigated by the coroner of Le Sueur county. The circumstances of such accident were not shown. Plaintiff also offered testimony, which was received, of experiments made by St. Peter city officials, the coroner and sheriff of Le Sueur county, and of investigations and conferences between the officers mentioned and representatives of the railroad and warehouse commission and the highway commissioner subsequent to the accident of September 25,

1937; also testimony of divers persons who had narrow escapes from collisions with trains at this crossing; among others of the latter sort was that of the mayor of St. Peter, who in a hurry in driving east on this highway toward the crossing, which he knew had the "stop" sign, determined to ignore the sign and had a narrow escape from running into a freight train then on the crossing. Assuming for the purpose of this decision that such evidence was properly admitted, we nevertheless are of opinion that it fails to prove this crossing extra-hazardous so as to come within the rule of Licha v. N. P. Ry. Co. 201 Minn. 427, 276 N. W. 813. There it appeared that Maryland street, in the city of St. Paul, approaching the railroad crossing from the west descends a steep grade, but just before the railway crossing there is a slight rise in the grade. That results in deflecting the head-lights of a motor vehicle down so as not to disclose the crossing until the rise in grade is reached, and that is too near the track to permit the vehicle to be stopped. Another fact shown in that case was that the city there maintained a street light at the cross-ing which was turned off at 2:30 in the morning, whereas the accident there involved took place after 3:00 o'clock on a dark, foggy morning. Munkel v. C. M. St. P. & P. R. Co. 202 Minn. 264, 278 N. W. 41, is also relied on by the plaintiffs, but there the railway company at a station in a village emitted steam and smoke, which interfered with visibility of the train upon the crossing to the approaching motorist, and is not in point here. In considering whether the defendant railway breached any duty owing plaintiffs in occupying this crossing with its train the night in question, we think it had the right to assume that motor vehicles at night were equipped with such headlights as the stat-utes require. The defendant railway entered this crossing when plaintiffs were about starting the Ford or upon the bridge 1,000 feet away. It had the right of way. It is clear that it could not have maintained the electric bell after the railroad and ware-house commission had ordered it replaced by the "stop" signs. It appears that no watchman or gates are maintained at any

184

rural railroad grade crossing in the state. If this right-angled railway crossing, in a rural territory where both the railway track and the highway are practically level and straight in both directions and all statutory warnings complied with, can be found to be extra-hazardous by a jury, then every railroad grade crossing in the state could be so found. We are of the opinion that the evidence fails to show any negligence either of commission or omission of the defendant railway which proximately contributed to this most unfortunate accident. We do not reach the question of contributory negligence. The driver's negligence could not, at any rate, be imputed to the sleeping passengers.

The orders must be reversed with direction to enter judgments for defendants.

Mr. Chief Justice Gallagher took no part in the consideration or decision of this case.

