JOHN P. PIRNER v. NORTHERN PACIFIC RAILWAY
COMPANY AND ANOTHER.

104 N. W. (2d) 175.

July 8, 1960—No. 37,959.

*M. L. Countryman, Jr., Earl F. Requa,* and *W. S. Lycan, Jr.,* for appellant.

*Joseph W. Ryan,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying motion of defendant railway for judgment notwithstanding the verdict or for a new trial.

This personal injury action arose out of a collision between a truck, operated by plaintiff and owned by Zontelli Brothers, and a train consisting of a Diesel engine and a caboose owned and operated by defendant Northern Pacific Railway Company. Melvin Bloomstrom, engineer on the Diesel, was also joined as a defendant.

The accident occurred at about 1:50 p. m. on October 18, 1956, at a railroad crossing. Hanna Coal & Ore Corporation owned the crossing site. In 1951 the Northern Pacific put in tracks, which passed over this and other crossings, under a license from Hanna Coal. The license was made subject to all other licenses, easements, or rights-of-way. Zontelli Brothers' trucks had the right from Hanna Coal to use the roads in the area and Northern Pacific had to move its tracks whenever ordered by Hanna Coal.

Plaintiff started driving a large Euclid ore truck for Zontelli Brothers in 1952 and continued to do so until the time of the accident. Prior to that time, from 1947, he had driven a similar truck for Hanna Coal. He said that he was familiar with the capabilities of the truck as to speed, power, and performance; that he knew that it had no speedometer, mirror, or turn signals and that he could look back on the left side of the truck—the side on which he was driving—only by opening the window or door of the cab.

The weather was clear and warm and the roads dry. Plaintiff had been hauling ore from the Mahnomen Mine in the Cuyuna Range to the chemical plant at Riverton—approximately a 6-mile haul. He was returning to the mine for another load when the collision occurred.

The tracks on which the train was moving run in a general north

and south direction. The train, prior to and at the time and place of the accident, was backing up in a northerly direction with the caboose in front of the engine. Plaintiff was also proceeding northerly on a road that ran parallel to the track—called the "side" or "parallel" road—which he said was rough. Two railroad crossings, referred to as the "north" and "south" crossings, were involved. They were 1142 feet apart. The accident happened at the "north" crossing. Defendant Bloomstrom, the engineer, said that he never saw signs indicating that vehicles should stop at either of those crossings but there was one at a so-called "blind" crossing near the Virginia plant. There was evidence that trains do not operate on schedule over crossings in the mining area involved.

Plaintiff testified that on his return trip to the mine, prior to the accident, he crossed the railroad track at a junction (Huntington) about three-fourths of a mile south of the "south" crossing; that he looked but did not observe any train, nor did he see one as he drove north towards the "south" crossing. He said that he approached the "south" crossing at about 26 miles per hour and that when he was between 100 and 200 feet from that crossing he looked south, down the track, and saw no train. He then shifted to a lower gear and slowed to about 18 miles per hour. As he crossed over the "south" crossing he claims that he again looked south and saw no train coming. He said that he slowed his truck to 14 miles per hour as he traveled north on the "parallel" road and further reduced his speed to about 8 miles per hour as he made the turn onto the "north" crossing where the accident occurred.

He said he drove with the truck windows partially lowered so that he could hear a horn in case another truck wanted to pass. He explained that during his years of truck driving in that area he had heard train whistles or horns before, but not on this occasion.

He testified that he turned onto the "parallel" road, close to the tracks, because Hanna trucks were coming on the main road. He stated that trains usually move slowly through those crossings; that when they came from the south he would hear the whistle blow "pretty near every time"; but when they came from the north he "got a clear view, it wouldn't have to probably whistle."

Plaintiff said that as he came north on the "parallel" road towards the "north" crossing he was driving on the right or east side, closest to the railroad tracks, which were 4 to 8 feet away. He was asked on direct examination:

"Q.   All right. What did you do, and what happened?

"A.   Well, I pulled out on there, and by the time I turned so I could look down the track, my front wheels must have been just about on the track.

"Q.   So you could look in what direction? To the south?

"A.   Back. To the south.

"Q.   What did you see at that time?

"A.   I seen a train.

"Q.   Would you tell us about where it was, how far it was away?

"A.   It was about 75 feet from the crossing.

"Q.   And what did you observe about the train?

"A.   I could see the caboose. And it was coming at a high rate of speed.

"Q.   And what did you do?

"A.   I knew I couldn't stop. It wouldn't do any good, because it would hit the front end of it, and possibly the same place, if I had tried to stop. So I stepped down as much as I could and tried to get over.

"Q.   What happened?

"A.   I got hit.

"Q.   Were you watching the train as it came toward you?

"A.   I did. Watched it all the way.

"Q.   And were you looking out of your right door window there at that time?

"A.   That's right.

"Q.   What part of the train hit you and what part of your truck was hit?

"A.   The back end of the caboose hit me, and it hit me about the middle of the truck, just in front of the dual wheels. Or just behind the cab.

"Q.   Did you at any time as you were driving along this parallel road hear any train horn or whistle?

"A.   No."

In that connection another witness (Hobart A. Masters), who watched the collision from 350 feet away, said he heard no whistle or bell. One Robert Anderson, who was close to the scene of the accident, said he heard no train horn or whistle; and another witness, Harold T. Lundgren, who observed the collision from the lakeshore 300 feet away, said that he did not hear any horn or whistle from the train prior to the collision.

Defendant Bloomstrom, the engineer, testified that he blew the whistle on the Diesel at the "south" and "north" crossings. He claimed that the truck operated by plaintiff crossed the "south" crossing after the train passed it; that it came along side of the train on the "parallel" road to the west while his train was travelling 20 to 30 miles per hour;[1] that it overtook the train and turned on the "north" crossing where it was hit. He said that he applied the brakes when the engine was "approximately 40 feet off the crossing from the end of the caboose."

Plaintiff argues that it was physically impossible for him to overtake the train in view of the speed shown by the tape recordings as compared with the maximum 26 miles per hour capability of the truck, as well as the testimony of his witnesses that the train overtook the truck.

The fireman on the Diesel testified that he was sitting in the east side of the engine; that with the caboose shoved ahead of the engine he could "view all the way" down the track as he had a sliding window open on his side and that he "was what we call leaning out the window, looking, head and shoulders, out." It was his estimate that in that position he could see both rails of the track 40 to 50 feet ahead and could see also for some distance ahead of the caboose.

As the train approached the "south" crossing, while he was sitting on the side of the engine closest to the "parallel" road, he said that

---

[1]Defendant's engine was equipped with a tape recording device which showed that the train reached a top speed between the Huntington junction and the "south" crossing of 25 miles per hour; that at the "south" crossing it was reduced to about 17 miles per hour and from there to the point of collision increased to approximately 32 miles per hour.

he saw plaintiff's truck running about flush with the back of the Diesel; that the train went over that crossing first and that he then saw plaintiff's truck go over the "south" crossing "directly behind us." He did not see it again until after the collision. When asked if he heard a whistle sounded at the "north" crossing or the "south" crossing, his answer was, "Yes, I did."

The court instructed the jury that there were three issues as to defendant's negligence, (a) excessive speed, (b) failure to whistle, and (c) improper lookout. The jury returned a verdict for plaintiff against the defendant railway company but in favor of the engineer Bloomstrom.

■ It is the position of the railway company that, since it could be held liable only through the negligent actions of its employees, and since the jury found the engineer not negligent, it must have found negligence on the part of the railway company on some ground that could not have been submitted to them under the evidence. It is, therefore, the contention of the company that on this record the verdict cannot stand because there was no actionable negligence on its part. It contends also that plaintiff was negligent as a matter of law.

Plaintiff claims that the legal questions involved are (1) whether the train crew failed to keep a proper lookout while approaching the crossing in the backing up movement of its train which was accelerating its speed, and (2) whether plaintiff used reasonable care in looking and listening for the train before entering the crossing.

Among the forms of verdict submitted by the court to the jury was one for use if it found for plaintiff against the railway company because of negligence on the part of members of the crew other than the engineer.

In the light of its verdict that the engineer was not guilty of negligence as to excessive speed, failure to whistle, or improper lookout, the jury must have determined that there was negligence on the part of some other members of the crew. While that question is a close one, under the record here, there was some evidence from which the jury might have determined that the trainmen riding in the caboose or on the back platform as it approached the "north" crossing did not keep

a proper lookout or should have blown the caboose air whistle. Evidence in that connection is somewhat limited as Warren C. Field was the only survivor of the caboose crew to testify.

He said that after they left the Huntington junction where they made a switch movement he rode on the back end of the caboose until they got over the first crossing about 100 feet from the junction switch. He then went inside the caboose until the train got to the "south" crossing, then "went back out to the back platform." He saw no vehicles on the highway prior to reaching the "south" crossing, nor between the "south" and "north" crossings although he said that he made an observation in that direction.

His testimony is somewhat confusing as to just when he first saw the truck involved in the accident. At one place he estimated possibly 150 feet from the crossing. When questioned as to where the truck actually was when he first noticed it he replied that it was just making the turn, at which time the train was approximately 100 feet from the crossing. He said that a trainman who was killed was on the left (west) side of him on the platform—the side closest to the "parallel" road. He recalled that they were near the air hose but did not remember which one was holding it. He was then asked:

"Q. Well, after you saw the truck turn, what happened?

"A. Well, we hit then."

■ We next come to the question whether plaintiff used reasonable care in looking and listening for the train before entering the crossing. In other words, was he guilty of contributory negligence as a matter of law.

The principles of law applicable to public railroad crossings are well settled. If the driver of a vehicle involved in a collision with a train at a railway crossing has an adequate opportunity under the surrounding circumstances to know of and see an approaching train in time to avoid a collision, he is guilty of contributory negligence as a matter of law. Dahlquist v. Minneapolis & St. L. Ry. Co. 230 Minn. 203, 41 N. W. (2d) 587; Carlson v. Chicago & Northwestern Ry. Co. 96 Minn. 504, 105 N. W. 555, 4 L.R.A. (N.S.) 349, 113 A. S. R. 655; Turner v. Minneapolis, St. P. & S. S. M. Ry. Co. 164 Minn. 335, 205 N. W. 213.

Here we have a situation where the crossing involved was a wide open, substantially level, unobstructed one. The accident occurred on a clear day when visibility was perfect. Plaintiff was thoroughly familiar with the crossing and the area in which he was working as well as with the truck he was operating. He had been making similar hauls from the mine to the chemical plant for some time before the accident. He knew that trains operated on the tracks and over the crossing involved, also that there was no speedometer on the truck and that because of its construction and the lack of a rear view mirror he had no view to the right rear. He also knew that he could get a view to the left rear only by opening the window or cab door. Yet, under all those circumstances and conditions, he took his last look for a north bound train when he was at the "south" crossing—1142 feet away from the place where the accident occurred. In other words, he drove more than one-fifth of a mile, enclosed as he was in the cab, at a speed of about 14 miles per hour and turned abruptly onto the crossing at a reduced speed of about 8 miles without looking again until it was too late to stop.

In Rintala v. Duluth, W. & P. Ry. Co. 159 Minn. 499, 199 N. W. 562, we held that a driver of an automobile, approaching a railway crossing under conditions obstructing his view of an approaching train, who omits all precautions for his own safety on the assumption that no train is due, is guilty of contributory negligence as a matter of law. In that case the truck had a cab with swinging doors which enclosed the driver's seat and the usual mechanism for control, and this court said (159 Minn. 503, 199 N. W. 564):

"The driver cannot shut himself in the cab of his truck, where the use of his senses of sight and hearing are much hindered by obstacles of his own imposition, and then blindly attempt to cross a railway without first using his eyes or his ears free from the hindrances he himself has imposed on their use, and, by whatever standard his conduct is judged, be considered in the exercise of due care."

Under the circumstances here we are compelled to say that the plaintiff was guilty of contributory negligence as a matter of law. See, Hicks v. N. P. Ry. Co. 239 Minn. 373, 58 N. W. (2d) 750; Massmann v.

G. N. Ry. Co. 204 Minn. 170, 282 N. W. 815; Luce v. G. N. Ry. Co. 203 Minn. 470, 281 N. W. 812.

Plaintiff argues, however, that we are not here concerned with a public road or public crossing; that the railroad company did not own its right-of-way; that the train was not on a scheduled or through movement; and that the trains and ore trucks were engaged in the same and equal purpose of moving iron ore over private property. He cites 16 Dunnell, Dig. (3 ed.) § 8186, with reference to the rule for trains operated by railroads along their own rights-of-way. It is his contention that under the rules set out there a public highway must be involved and the train must be on the railroad's own property. He claims that the basis for the rule is the public interest in and the necessity of trains moving freight and passengers on schedule which could not be done if trains were stopped for each highway crossing. The plaintiff maintains that these reasons of public necessity do not exist in this case and for that reason the well known train right-of-way rule should not apply.

It is true that under the record here we have a somewhat unique condition where the right-of-way was owned by the mining company and the railroad tracks were laid by the railroad company under a license from the mining company. Nevertheless, a review of the exhibits clearly discloses that the area over which plaintiff operated the truck consisted of numerous highways and roads for the transportation of ore. It is also clear that the railroad tracks had been there for many years while plaintiff was working as a truck driver in that locality. Many ore vehicles passed over the highways and crossings in that area and trains passed over the tracks daily. Clearly it would seem absurd for us to say that under those conditions plaintiff could disregard rules of highway and railway crossings on a technical claim that the railway company was merely operating under a license. Rules of reasonable care and commonsense in connection with the operation of motor vehicles should be applicable under any circumstances and especially under those involved here. It does not seem unreasonable to require plaintiff to exercise that care which an ordinarily prudent person would exercise under the same or similar circumstances.

The United States District Court, under the same facts as here involved, found plaintiff's employer, by its ownership and operation of this same truck, guilty of negligence as a matter of law and such negligence was the proximate cause of the accident and its consequences. See, N. P. Ry. Co. v. Zontelli Bros. Inc. (D. Minn.) 161 F. Supp. 769.

Reversed.