# HERMAN E. KOOP v. GREAT NORTHERN RAILWAY COMPANY.[1]

July 3, 1947.

No. 34,387.

[1]Reported in 28 N. W. (2d) 687.

*Edwin C. Matthias, J. H. Mulally,* and *R. J. Quinlivan,* for appellant.

*Phillips & Sherwood,* for respondent.

MAGNEY, JUSTICE.

Plaintiff, having recovered a verdict of $50,000 against defendant, the latter appeals from the order denying its motion for judgment notwithstanding the verdict or a new trial.

First avenue northeast, also known as Riverside Drive, in the city of St. Cloud, crosses the tracks of defendant. The width of this street between property lines is 66 feet. From the property line to the sidewalk on each side is 11 feet. The sidewalks are 4 feet wide. The black-topped driving surface is 30 feet wide. Between the sidewalks and the paved area are boulevards 3 feet wide. The street runs in a general north and south direction. North of defendant's main track and within a few feet of it is a spur track running to a coal shed, located east of the street, 27.35 feet from the center of the main-line track, and 24.4 feet from the pavement. An arc light is suspended 23.4 feet above the center of the street about 100 feet north of the main line. On the west side of the street, the distance from the center of the main line to the north line of the right of way is 75 feet. Where the north line of the right of way and the west property line of the street intersect is a box-elder tree, 18 inches in diameter, the trunk touching the right of way, but practically all of it on the street right of way. The branches extend 9 feet easterly from the westerly curb line, with the lower branches 9 or 10 feet from the ground. North of the tracks and 4.7 feet west of the sidewalk is a standard crossing sign with the words "Railroad Crossing" on it. On the post of this crossbuck sign, 7 feet above the ground, there is a sign with the word "Stop" in large letters, lighted by a kerosene lamp on each side of it. On the south side of the

tracks and to the east of the street is a street railroad crossing sign 12 feet high with the word "Danger" on a metal cross piece, with a flashlight signal operated by a battery and equipped with a bell which sounds when a train approaches and crosses the street. Between the sidewalk and the curb at that point there is also a standard crossing sign. The street is straight for approximately 900 feet to the north of the tracks. The elevation 640 feet north of the tracks is 96.2 feet above city datum line. From that point on there is a gradual rise toward the tracks. The elevation of the main line is 100.43 feet. In something over 600 feet, therefore, the upgrade is about 4.23 feet. The elevation 340 feet north of the tracks is 3.9 feet below the level of the tracks. The elevation 140 feet north of the tracks is 97.5 feet, or 2.93 feet below the level of the rails, and 40 feet from the tracks it is 99.1 feet, or 1.33 feet below the level of the rails. At no point within 640 feet of the tracks is there a downgrade.

The accompanying photograph (exhibit B), taken to the right of the center of the street and 125 feet north of the tracks, gives a better idea of the crossing in question than is possible by a mere description in words.

Shortly after five o'clock on the morning of August 31, 1945, plaintiff and his wife, on their way home from a friend's home in Sauk Rapids, were approaching this crossing from the north at 25 to 30 miles an hour in a Cadillac automobile owned and operated by the wife. They ran into a moving freight train heading west. Plaintiff and his wife were seriously injured. The train, made up of about 50 boxcars, gondolas and tank cars, an engine, and a caboose, but no flatcars, was crossing the street at 3 to 8 miles an hour. After the accident, the automobile was standing about in the center of the street, about 6 or 7 feet from the train, facing the tracks. The train crew knew nothing of the accident until the following afternoon. The whistle was blowing and the bell ringing when the engine crossed the street, and the signal crossing bell south of the tracks was sounding.

Riverside Drive Crossing, St. Cloud Minn. 9-26-45
Camera 185 ft. north of the center of the main track crossing, looking southerly.

It had been raining during the night, and there is some testimony to the effect that it was raining at the time of the accident. Other witnesses say that it was not raining. Plaintiff testified that he had no difficulty seeing through the windshield; that there was no obstruction to his vision; that he had a clean windshield; and that he was watching ahead as they drove along. Both plaintiff and his wife say they did not see the train, the railroad crossing, or any warning signs or signals. They testified that they knew that any roads, streets, or highways running from St. Cloud to Sauk Rapids crossed over that line of the Great Northern, and the wife testified that she knew the street on which they were driving was a street which crossed this line of the Great Northern. The lights of the Cadillac were in good condition and capable of revealing a person, an object, or a vehicle on the highway several hundred feet ahead. The street light 100 feet north of the crossing was burning, and the crossing was well lighted.

On these facts from the record as we have detailed them and the instructions of the court, the jury returned a verdict for plaintiff.

Defendant urges several errors on the part of the court which in its opinion entitles it at least to a new trial. It appears that Rosemary O. Koop, plaintiff's wife, who drove the car on the night in question, gave a statement to an agent of defendant a few days after the accident while she was still in the hospital. On cross-examination at the trial she was asked:

"Q. And that he [the interviewer] asked you, 'Had you driven over that crossing before?' and you said, 'I have driven over it several times, but I had not been over that road now since—it was last March or April, I think, since the last time I was over it. *I knew that the crossing was there.*'

"A. I am sorry if I said I had never driven over that road before. I had been over it.

"Mr. Sherwood: Mrs. Koop, the question isn't what is the fact. The question is what you said to this man.

"A. Well, that is very vague, what I said to him.

"Mr. Quinlivan: Well, do you deny having said that to him?

"A. I don't remember that.

"Q. You don't remember that?

"A. No." (Italics supplied.)

As to several other questions asked her with reference to what she said to defendant's agent, she answered, "I don't remember."

Defendant called as an impeaching witness Richard C. Rodenberg, employed in its claim department, using a purported statement taken from Mrs. Koop. The court sustained an objection to this offered impeaching evidence on the ground that no foundation was laid. Defendant claims that the court erred in its ruling. Mrs. Koop testified that she did not remember having made the statements inquired about. She neither affirmed nor denied them, nor did she admit having made them.

In 3 Jones, Evidence, § 849, we find the rule stated as follows:

"* * * The prevailing view, however, is that, in order to justify admission of the impeaching statement, the witness need not have denied that he made it. If he does not remember having made the statement, and will neither admit nor deny having done so, it is generally held that proof of the statement is admissible."

In State v. Nelson, 91 Minn. 143, 148, 97 N. W. 652, 654, this court said:

"* * * At the suggestion of the court, after holding that the letter was privileged, Sutton was called by defendants and interrogated concerning the letter and its contents, and in response to most of the questions stated that he did not remember what it contained. A proper foundation for impeachment was thus laid * * *."

See, also, State v. Callahan, 100 Minn. 63, 110 N. W. 342; Rittle v. St. Paul City Ry. Co. 149 Minn. 216, 183 N. W. 146.

In 6 Dunnell, Dig. § 10351, it is said:

"Every witness under cross-examination in any proceeding, civil or criminal, may be asked whether he has made any former statement, oral or written, relative to the subject-matter of the action and inconsistent with his present testimony, the circumstances of

the supposed statement being referred to sufficiently to designate the particular occasion, and if he does not distinctly admit that he has made such a statement, proof may be given that he did in fact make it. To exclude the contradictory statement the admission of having made it must be unequivocal. It may be admitted if the witness 'thinks' he did not make it, or does not 'recollect.' "

The court erred in sustaining the objection to the offered impeaching testimony on the ground that a proper foundation had not been laid, as a proper foundation had been laid.

■ In its charge to the jury the court said:

"* * * The question for you to determine is whether or not the signs that were there were *sufficient to admonish the parties of their approach to the crossing* in time for them to avert the injury which they suffered." (Italics supplied.)

The duty of defendant to provide signs or warning signals cannot be measured in that manner. Different individuals may require different signs or signals to admonish them of their approach to a railway crossing. What is required of a railway company is to exercise reasonable care to provide and maintain necessary safeguards to warn the traveling public of the existence of the crossing. The language used in Restatement, Torts, § 301, *comment e,* is pertinent. It states:

"The actor is required to exercise reasonable care to give an effective warning to those likely to be affected by his act but he is not bound at his peril to bring the warning home. He is required to do that which a reasonable man would regard as necessary to this end, but he is not required to do more than a reasonable man would regard as sufficient."

See, also, Olson v. D. M. & I. R. Ry. Co. 213 Minn. 106, 5 N. W. (2d) 492.

In its charge the court also stated:

"* * * If the plaintiff or Mrs. Koop should have seen the train and if the warnings then present were sufficient to admonish them

of the danger in time for them to avert it, then plaintiff cannot re-cover in this action. On the other hand, if the crossing was extra-hazardous as it was maintained * * *, and if the warnings then present were not such as to admonish *plaintiff and his wife* of its existence as they approached in time for them to avert the danger, * * * then you will come to the question of damages." (Italics supplied.)

The court adopted an erroneous standard in measuring the degree of care required of defendant. It constituted reversible error.

■ The court also instructed the jury, in commenting upon the care required of plaintiff and his wife, as follows:

"* * * In other words, everyone is required, * * * to use his or her senses but, of course, one is not required to see that which is not visible. If it is visible one is required to see it. If it is not visible under the existing circumstances, then of course you are not because the law does not require the impossible."

Obviously, the passing railway train under the facts of this case was visible. If plaintiff or Mrs. Koop failed to see the train, it was not because it was not visible. In effect, the court told the jury that the law does not require an impossible thing, namely, to see an invisible train. But it also leaves an inference that a train moving over a crossing may be invisible, thus excusing one from seeing it. We think the court erred in giving this instruction.

It seems unnecessary to consider other claimed errors in the charge. From what we have already said, an order granting a new trial necessarily follows.

■ Defendant urges that the verdict of $50,000 is excessive, ap-pearing to have been given under the influence of passion and prej-udice. Plaintiff is a physician and surgeon. For 20 years he prac-ticed successfully in the village of Cold Spring. In the accident, he suffered a concussion of the brain, an injury to his back, and several bruises. In analyzing his own symptoms, he concludes that he had a compression fracture of a vertebra in the spine. In a compression fracture, the bone is not actually fractured, but the front part of

it is pushed or squeezed together. The X rays failed to disclose a fracture of the skull or a compression fracture or any other definite fracture. Because of its claimed location, the physicians testifying said that the fracture of the vertebra might be there and the X ray fail to disclose it. Plaintiff was taken to the St. Cloud Hospital, where he remained four days. Then he went to the Northwestern Hospital in Minneapolis, where he also remained four days, returning from there to his home in Cold Spring. He did some work shortly after he returned and tried to resume practice after six weeks. At the time of the trial, he claimed that his neck was bothering him, the pain being located at the base of his neck and between his shoulder blades; that the motion of his neck was limited; and that he became easily fatigued. Although he was naturally stoop-shouldered, he claimed that he became more stooped. He claimed that he was suffering from a nervous condition, with its various ramifications, such as headache, dizziness, insomnia, and sleepwalking, with a tremor in a hand. He thought that he ought to discontinue practice for at least six months. Dr. Harvey Nelson, who treated plaintiff while he was at Northwestern Hospital in Minneapolis, testified that plaintiff had a preëxisting arthritic condition in the area of his back where he experienced pain. He said of this:

"* * * Frankly, I do not know whether it is an arthritic change or a fracture of the front part of the vertebra."

Dr. Nelson, when asked what his prognosis was with respect to the neck condition, said, "And as to the actual prognosis, I don't know." He was asked:

"Q. * * * Is it possible for you to express an opinion with any reasonable medical certainty as to when, if ever, he is likely to recover?

"A. I don't believe I can. So far there has been no substantial recovery take [sic] place. During the months in the fall and up to the first of the year, he did improve, but since then I think he has been getting worse."

Plaintiff did not consult any specialist in cases of nervous disorders until about two days before the trial, when Dr. W. P. Gardner made an examination of him, apparently chiefly for the purpose of qualifying as a witness. He testified:

"* * * The general physical examination revealed no significant findings pertinent to the present illness, with the exception of the limitation of rotation of his neck, or moving the neck to the right or left."

Dr. Gardner also testified that plaintiff had a scar over the left elbow, was holding his head forward and downward, and had a tremor of the hand. He said that plaintiff was suffering from abnormal nervous tension. It was his opinion that "he is partially disabled at the present time because of this nervous condition which has appeared as a result of the injury sustained on August 31, 1945." He was asked:

"Q. And from your examination and from your knowledge and experience of the subject is it possible for you to state at this time with reasonable certainty when he will recover from the condition which you describe?

"A. I can't state that with reasonable certainty."

Plaintiff claimed a change in his posture and could not "conceive of any manner in which that condition could be corrected." He described his condition at the trial thus:

"Well, at the present time I have this stiff neck, limited in motion, I have these continuous headaches, I have these occasional exacerbations of the headache."

Altogether, plaintiff spent eight days in hospitals. He resumed practice six weeks after the accident. In his complaint he alleged that "by reason of the injuries so sustained he was prevented from performing any of the duties of his occupation and profession for a period of two weeks, and from performing the major portion of said duties for the further period of six weeks," and that thereafter up to the time of service of the complaint "he has been prevented from

performing all of the duties of his occupation and profession, * * *."
He testified that he had an expectancy of income for that year in the
neighborhood of $30,000, and that his estimated income had been
curtailed for a nine-month period by about $5,000.

In our opinion, on the evidence which we have detailed and which
is so uncertain and indefinite as to plaintiff's future disability, the
verdict of $50,000 is excessive, appearing to have been given under
the influence of passion and prejudice. This alone necessitates a
new trial.

We have given a detailed review of the facts in the case. In-
cluded is a verbal description of the crossing in question and a
photograph of it received in evidence. All the warning signs and sig-
nals required by statute or by order of the railroad and warehouse
commission were present. Plaintiff claims that the evidence shows
that the crossing is extrahazardous, and it was a question for the
jury to determine whether under its duty of care defendant should
have furnished additional signs or signals.

In Crosby v. G. N. Ry. Co. 187 Minn. 263, 267, 245 N. W. 31, 32,
the court said:

"Undoubtedly cases do and will arise where a railroad company,
because of peculiar and unusual facts and circumstances rendering
the situation extrahazardous, must in the exercise of reasonable
care do things which are not required by statute."

This question is discussed in the later case of Ausen v. M. St. P. &
S. S. M. Ry. Co. 193 Minn. 316, 258 N. W. 511. In Licha v. N. P. Ry.
Co. 201 Minn. 427, 276 N. W. 813, and Munkel v. C. M. St. P. & P. R.
Co. 202 Minn. 264, 278 N. W. 41, the court held that there were
present circumstances which made the crossings extrahazardous, re-
quiring additional precautions. In the Licha case, plaintiff was a
passenger in the car colliding with a train. The accident occurred
after three o'clock in the morning at a crossing within the city of
St. Paul. The street sloped toward the track, and the defendant's
tracks were so located in a depression that the lights from the auto-
mobile would not disclose the presence of the train in time for a

careful driver to stop. The electric light at the intersection was extinguished at 2:30 a. m. This court said (201 Minn. 429, 276 N. W. 814):

"The driver could not see the [stop sign] post by reason of its location and the darkness and fog with which it was surrounded, nor the train and tracks by reason of the grade of Maryland street descending to within a short distance of the tracks, the rise just before reaching the tracks, * * *."

It was held that a railroad company may be required to take precautions in the management and operation of its road with respect to the public safety in addition to those required by statute or order of the railroad and warehouse commission. And in the Munkel case, the defendant's engine, left on a passing track, was emitting a great deal of smoke and steam, which mingled with the natural fog and mist surrounding the crossing. The crossing was at the outskirts of a village, where there were (202 Minn. 265, 278 N. W. 43) "parallel tracks * * * one for passing and a main track" crossing the highway. A truck in which plaintiff was a passenger collided with a standing freight train. In affirming an order favorable to plaintiff after a verdict in her favor, the court said (202 Minn. 267, 278 N. W. 44):

"Ordinarily, a railroad company is not negligent in operating or permitting a train to stand across a public highway either in the day or nighttime. A train on a crossing is visible to drivers on the highway, including automobile drivers whose cars are equipped with lights and who exercise ordinary care. It has often been said that the train itself is an effective and adequate warning. But this is not always so. Peculiar and unusual facts and circumstances making the crossing an exceptional or unusually dangerous one may require the taking of such precautions as prudent management with respect to public safety requires, though such precautions may be in addition to the requirements under ordinary conditions. Licha v. N. P. Ry. Co. and Crosby v. G. N. Ry. Co. *supra;* Ausen v. M. St. P. & S. S. M. Ry. Co. 193 Minn. 316, 258 N. W. 511."

The court in the instant case submitted for the jury's determination the question whether the crossing in question was just an ordinary crossing or an extrahazardous one, and, if it found that the crossing was an extrahazardous one, whether defendant was negligent in failing to provide and maintain additional necessary safeguards to warn the traveling public of the existence of the crossing.

The detailed description of this crossing has already been given. It seems unnecessary to review the facts again. The majority of the court is of the opinion that the facts present a question for jury determination whether the crossing was extrahazardous and whether additional signs or signals, such as reflector lights or other warning devices, should be required of defendant in the exercise of due care— a view not shared by the writer of this opinion.

For errors committed, a new trial must be granted.

Order reversed.

JULIUS J. OLSON, JUSTICE (concurring in part and dissenting in part).

Of course the case must be reversed for the reason so ably recited by Mr. Justice Magney. But I think the record in this case is such as clearly to show that the warning devices maintained by defendant at the crossing in question were all that ordinary care requires. The crossing presents nothing extrahazardous. Therefore, it is my opinion that judgment should be ordered for defendant notwithstanding the verdict.