## LEONA C. CAMERON v. NORTHERN PACIFIC RAILWAY COMPANY AND ANOTHER.[1]

June 15, 1951.

Nos. 35,330, 35,331.

[1]Reported in 48 N. W. (2d) 540.

*Bradford & Kennedy,* for appellant.
*M. L. Countryman, Jr.,* and *Earl F. Requa,* for respondents.

CHRISTIANSON, JUSTICE.

These appeals arise out of two wrongful-death actions, consolidated for trial, brought by the special administratrix of the estates of Franklin and Kenneth Cameron to recover for their deaths in a

grade-crossing collision allegedly caused by the negligence of defendants Northern Pacific Railway Company and George Hankey, an engineer employed by that company. The jury returned a verdict for defendants in both cases. Plaintiff appeals from the orders denying her motions for a new trial. In a memorandum attached to its orders denying a new trial, the trial court expressed its conviction that plaintiff had failed to prove actionable negligence and that verdicts should have been directed for defendants. If the trial court's conclusion is correct, it is unnecessary to consider the many assignments of error alleged to have been made in the instructions to the jury.

The fatal collision occurred on December 27, 1947, at the grade crossing located in the small village of Aldrich, Minnesota. The crossing is formed by the intersection of defendant railway's tracks, which run east and west, and state aid road No. 2, which runs north and south. The state aid road is unpaved and slopes slightly to meet the tracks. The steeper grade is to the north, where the road rises 3.2 feet in a distance of 142 feet, and is computed as 1.9 percent. At the crossing are three sets of tracks. The most northerly is an auxiliary track; 40 feet south of it lies the westbound main track; and about nine feet farther south is the eastbound main track. To the west of the crossing both main tracks are straight for a distance of 4,500 feet. The local depot and coal sheds are located in the northwest quadrant of the crossing. Both approaches on the crossing are guarded by the customary railroad crossbuck signs to which are attached "reflectorized" yellow-and-black stop signs. The main tracks are used by 30 trains daily, 20 freight and 10 passenger. Only one of each type stops regularly, but other passenger trains stop on flag. No evidence was introduced to show the amount of vehicular traffic using the crossing.

Examining the events preceding the collision in the light most favorable to plaintiff, they appear as follows:

About 2:30 a. m. on December 27, 1947, after working all evening, the two Cameron boys departed in Kenneth's 1935 Chevrolet coach from the River Inn, which is located a short distance northwest of

the Aldrich crossing. Kenneth, age 23, was a more or less regular employe at the inn, and Franklin, age 13, had been acting as a "baby sitter" at the proprietor's nearby home. Their destination was presumably the Cameron home, which is located just south of the crossing.

At the time the boys left for home, one of defendant railway's regular eastbound passenger trains was approaching the Aldrich crossing at its usual speed of 71 miles per hour. Defendant George Hankey was engineer. The engine was equipped with a modern headlight, which was throwing a beam of light 1,000 to 1,200 feet ahead. At the whistle post, 1,300 feet west of the crossing, the engineer started the automatic bell and began sounding the train whistle. The Cameron car approached the crossing from the north and began to *back* across the tracks. While backing over the crossing the right rear wheel of the car went off the planking. The car bounded across the bare rails of the eastbound track, struck its rear bumper against the crossbuck signpost guarding the southern approach to the crossing, and stalled in that position. The crossbuck sign is located about five feet east of the state aid road and 12 feet south of the southernmost rail of the eastbound track. Since the automobile was approximately 15 feet long, when the rear of the car was backed against the post the front of the car extended onto the eastbound main track for about three feet. Although an emergency stop was attempted, the pilot of defendants' engine struck the left front wheel of the car, killing both occupants immediately.

At the trial, testimony disclosed that the crossing and the approaches thereto were slippery; that the wood of the crossbuck signpost was freshly gashed at bumper height; and that a tire rut, two or three feet long, six inches wide, and three-quarters of an inch deep was found in the snow one foot north of the post against which the car had stalled.

Plaintiff in her complaint alleged that defendants were negligent in failing (1) to maintain adequate warning signs at the crossing; (2) to maintain the crossing in a safe and passable condition; (3) to maintain a proper lookout; and (4) in running the locomotive

at a high and dangerous rate of speed under the existing conditions and circumstances. She also alleged that defendants were guilty of wilful and wanton negligence in failing to use reasonable care to avoid the collision after they had seen or should have seen the car in a position of peril. We shall review the record to find if the evidence was sufficient to warrant the submission of any of these issues to the jury.

■ No evidence appears from which a jury could reasonably infer either a negligent lookout, or wilful and wanton negligence on the part of defendants. Both the engineer and the fireman on duty with him testified that they had been keeping watch down the tracks from their respective positions on the right and left sides of the engine cab. The fireman testified that he first noticed the Cameron automobile entering the range of the train's headlight and beginning to back across the tracks when the train was about 500 feet from the crossing. He did not see any headlights on the car. Believing that the automobile would be able to cross safely, he did not call out to the engineer, whose view to the left was partially obstructed by the boiler of the engine extending approximately 60 feet ahead. The engineeer testified that about 150 to 200 feet from the crossing he saw the rear wheels of the car between the north and south rails of the eastbound track, and that he immediately "dynamited the train" and applied the sanders. This is the procedure for bringing the train to an emergency stop.

Plaintiff argues that there is evidence indicating that the car was stalled against the signpost for a significantly longer time than appears from defendants' testimony. With that as her premise, she reasons that defendants either failed to see what reasonably should have been seen, or that, seeing the car, defendants failed to use reasonable care to avoid the collision. The difficulty with this argument is that the evidence does not support the premise. It is true that a jury would not be bound to believe the testimony of the crewmen if other circumstances provided a reasonable basis for concluding that it was not true. Bryant v. N. P. Ry. Co. 221 Minn. 577, 23 N. W. (2d) 174; Havel v. M. & St. L. R. Co. 120 Minn. 195, 139 N.

W. 137. But, on the other hand, plaintiff had the burden of introducing evidence from which a reasonable inference of negligence could be drawn. Her only evidence relevant to the issue of how long the car was stalled was the tire rut found in the snow north of the post, and the testimony of Donald Cameron that while lying in bed in his nearby home he heard his brothers' car roar intermittently for "at least a minute" before the collision. Donald recognized the sounds as coming from Kenneth's car, because it had a characteristic sound which was due to the absence of any muffler. However, the length of time necessary to create such a rut was not shown; there is no way to determine if one revolution of the wheel or 20 such revolutions would be necessary. As to the testimony of Donald Cameron, it would be mere speculation to allow a jury to infer that all the sounds he heard took place while the car was stalled in front of the crossbuck sign, because uncontradicted testimony clearly showed that four or five rut marks of the same type were found on the northern approach to the crossing after the accident. Any finding that the car was stalled for an appreciable length of time, based upon this evidence, would be no more than conjecture.

■ We find no merit in plaintiff's contention that the railway company negligently failed to maintain adequate warning devices at the crossing. It is conceded that the warning signals placed at the crossing satisfied all requirements of our statutes and of the orders and regulations of the state railroad and warehouse commission. In the absence of a showing that the crossing is extrahazardous, compliance with these requirements ordinarily will adequately fulfill the railway's duty to use reasonable care in providing warning devices.[2] The question remaining, then, is whether the evidence presented would warrant findings that this crossing was extrahazardous and that in the exercise of due care the railway company should have provided warning devices in addition to those prescribed by statute or regulation.[3]

[2]Blaske v. N. P. Ry. Co. 228 Minn. 444, 37 N. W. (2d) 758; Koop v. G. N. Ry. Co. 224 Minn. 286, 28 N. W. (2d) 687, and cases cited.

[3]See, Jorgenson v. M. St. P. & S. S. M. Ry. Co. 231 Minn. 121, 42 N. W. (2d) 540; Leisy v. N. P. Ry. Co. 230 Minn. 61, 40 N. W. (2d) 626.

There is no hard and fast rule for distinguishing between ordinary railroad crossings and those which are extrahazardous. Each case must be considered on its own facts. While at the Aldrich crossing there is railroad traffic of 30 trains daily, the vehicular traffic cannot be assumed to be other than extremely light, in view of the fact that the crossing is located in a village of only 152 persons. The tracks are straight for long distances in both directions from the crossing, and a person approaching from the north, as in this case, can see without obstruction for 4,310 feet when at a point 30 feet from the center of the eastbound tracks. The grade of the intersecting road, although not level, is not at all extreme. The northerly approach, which is the steeper of the two, is computed as having a grade of only 1.9 percent. Considering all these factors together, there appears to be no reasonable basis upon which to classify this crossing as extrahazardous. It is uncontradicted that the train whistle was sounded and that the automatic bell was ringing for 1,300 feet before the train reached the intersection. We therefore conclude that there is nothing in the record which would support a finding that in the exercise of due care the railway company should have provided warning signals in addition to those prescribed by statute or regulation.

■ Plaintiff urges that in maintaining this crossing defendant railway has failed to meet the standard required of railroads with respect to the maintenance of tracks and approaches within their right of way at crossings within municipalities, as set forth in M. S. A. 219.07:

"Every railroad company shall construct and maintain in good repair and free *from snow or other obstruction,* wherever any of its lines cross a public road, sufficient crossings, consisting of:

"(1) Sufficient grades, extending the full width of the highway or that part thereof graded or used for travel, on each side of the right of way, * * *;" (Italics supplied.)

Evidence was introduced to show that, like the entire surrounding area, the approaches to the crossing were covered with hard-

packed snow and were slippery. The planks between the tracks also appear to have been slippery. However, there is no contention that the crossing was more slippery than any of the streets and highways in the surrounding area.

The statute requires the crossing to be kept free from "snow or other obstruction." Reading those words together, as we should, it appears that "obstruction" is the definitive word. The statute contemplates removal of only those substances which, if left on the crossing or approaches thereto, would form a barrier or obstruction to passage. In view of the nature of our Minnesota winters, to construe the statute as requiring the removal of all snow or ice from the crossing would be to impose an impossible task upon the railroads.[4] A statute regulating a lawful business will not be construed to impose absurd restrictions or unreasonable burdens.[5]

No evidence appears which would indicate that the snow or ice on the Aldrich crossing at the time of the collision formed any obstruction to travel over the crossing. On the contrary, plaintiff, as well as defendants, introduced several photographs of the crossing taken the morning of the accident which clearly reveal that no such obstruction existed. The planking is nearly bare, and the approaches, though covered with snow, appear to be substantially level.

The location of the crossbuck signpost against which the car stalled is also urged as evidence of negligent maintenance of the crossing. Both crossbuck signs were placed well within 75 feet of the tracks, as prescribed by statute,[6] and the unfortunate role they played in this tragedy cannot be urged as showing a failure to exercise due care. It could not reasonably be anticipated that a car would manage to lodge itself between the post and the tracks.

■ Before the question of train speed at a railroad crossing can

---

[4]For other instances in which our climate has been considered in measuring compliance with a standard of care, see *e. g.,* Blais v. M. & St. L. Ry. Co. 34 Minn. 57, 24 N. W. 558; Henkes v. City of Minneapolis, 42 Minn. 530, 44 N. W. 1026.

[5]State v. Levine, 173 Minn. 322, 217 N. W. 342.

[6]M. S. A. 219.18.

be submitted to the jury, there must be evidence either that the speed was greater than was usual at that place, or that special circumstances existed, known or which should have been known to the railway company, which made a lower speed necessary at that point.[7]

It is undisputed that the usual speed of the train involved in the accident was between 70 and 75 miles per hour when it made its night run over the Aldrich crossing. Since it was traveling at a speed of 71 miles per hour at the time of the accident, our inquiry must be directed to whether special circumstances rendered a lower speed necessary.

We do not regard the fact that the speed was such that the train could not be stopped within the range of its headlights as a special circumstance affecting the general rule. If it were, substantially all night travel would fall outside the rule. The headlight on defendants' train was of a modern type complying fully with the interstate commerce commission's regulation governing headlights on trains in interstate travel.[8] It was in good working order. There was no negligence involved in its use. Under these circumstances, the interest of the public in speedy transportation and regular time schedules during both day and night requires us to hold that the fact that a train cannot be stopped within the range of its headlights is not a special circumstance which will make the usual speed of a train negligent. As was said in Fischer v. C. & N. W. Ry. Co. 193 Minn. 76, 258 N. W. 5:

"* * * We are living in an age where speed in transportation of passengers and goods is an all-important consideration."

The contra decisions of other jurisdictions are few and old,[9] and the more modern authority is in accord with the position we here

---

[7]Ohrmann v. C. & N. W. Ry. Co. 223 Minn. 580, 27 N. W. (2d) 806; Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729; see, Bryant v. N. P. Ry. Co. 221 Minn. 577, 23 N. W. (2d) 174.

[8]I. C. C., Bureau of Locomotive Inspection (1947) Rule 129(a).

[9]Birmingham Mineral R. Co. v. Harris, 98 Ala. 326, 13 So. 377.

take.[10] The Minnesota decisions cited as contra authority are not in point. We are dealing with railroads operating on their own rights of way, and the rules governing headlights on streetcars or automobiles, which operate on public streets, do not have application here.[11] No corresponding public interest in high speeds exists in those cases. Nor does the case of Sweeney v. M. & St. L. Ry. Co. 33 Minn. 153, 22 N. W. 289, apply here. There, an engineer seeking to recover damages from his employer railroad company was found contributorily negligent in traveling at a speed that prevented him from stopping within the distance he could see. However, the engineer was operating the train immediately after a heavy storm, which he knew had caused washouts along that part of the road. Despite this notice of likely danger, he did not slacken his speed so that he might stop quickly.

Here, the nature of the crossing and the weather conditions have been sufficiently discussed in an earlier part of this opinion. It would be unfruitful to repeat that discussion. We find no special facts or circumstances in this case which would alter the general rule, and we hold that plaintiff cannot base a claim of negligence on the speed at which defendants' train was traveling.

After a careful examination of the entire record we are convinced that the trial court was correct in its conclusion that defendants' motions for directed verdicts should have been granted. The record fails to disclose any evidence from which actionable negligence on the part of defendants could be inferred.

Affirmed.

[10]See, Moody v. Texas & P. Ry. (La. App.) 37 So. (2d) 346; Edwards v. Thompson (La. App.) 2 So. (2d) 493; Payne v. Hamblin, 126 Miss. 756, 89 So. 620, 23 A. L. R. 146.

[11]Cf. Curran v. C. G. W. R. Co. 134 Minn. 392, 159 N. W. 955.