ELMER V. ENGBERG v. GREAT NORTHERN RAILWAY COMPANY.[1]

February 16, 1940.

No. 32,320.

[1]Reported in 290 N. W. 579.

*A. L. Janes* and *J. H. Mulally,* for appellant.

*Marshall S. Snyder, George R. Kodadek,* and *M. B. Hurley,* for respondent.

STONE, JUSTICE.

Defendant's motion for directed verdict denied, there was a verdict for plaintiff. Defendant appeals from the order denying its motion for judgment notwithstanding or a new trial.

The decedent, Florence Hill, as well as her husband and her son, lost her life when the automobile in which she was riding was run into at a highway crossing by a passenger train of defendant on the outskirts of the village of Hinckley. Decedent's husband was driving. The time was about noon of Sunday, February 12, 1939. The day was quiet and clear. There was no smoke to obscure view. There was nothing whatever to distract attention of the Hills as their car approached the crossing, which was that of highway No. 61. For convenience, we shall consider it as running north and south and the railroad east and west.

The automobile was traveling south, and the train came from its right, or the west. The highway was paved and straight until a short distance south of the crossing, where it swerves to the right. Much snow had fallen, and the road plows had piled it in windrows on either side of the highway. The one on the west side was about four feet. The intersection was not quite at right angles. The one on the right of the Hill car was somewhat obtuse, making the view along the railroad in that direction greater than it would have been had the angle been 90 degrees or less. The telegraph poles along defendant's tracks marked its route. For some distance west of Hinckley they carry three crossarms each. Further indicating the presence of the railroad were two semaphores, plainly in view from the highway.

Just west of the highway and roughly parallel to it are the tracks of the Northern Pacific Railway. They cross defendant's line 170 feet west of the highway crossing, where there is a signal tower from which is controlled the protective semaphores and other mechanism of the railway crossing. Four hundred forty-one feet west of the crossing of highway No. 61 by defendant's line is another highway intersection, referred to in the evidence as the stockyards crossing.

An attentive traveler, particularly in the daytime, could not avoid warning that he was soon to cross the railroad. Three hundred fifty feet north of the latter and to the right of the pavement was the usual advance warning sign of the state highway department. The crossing itself is protected by Griswold electric, automatic signals, one close on each side of the tracks and highway. The one on the north is the more important now. Above a concrete pedestal was an octagonal disk with the word "stop" in large black letters on a yellow background. Flanking the disk and just below it are two red electric lights, which are dark unless the signal is operating. The whole mechanism gets to work automatically when a train approaching from either direction closes the electric circuit. That happens 1,800 feet distant when the train comes from the west, as did the one in this case. The disk is parallel to the highway when not in operation. When

the circuit is closed, it turns to face approaching traffic. Simultaneously the red lights begin flashing alternately. Over each disk, and part of the same structure, is the familiar and large "sawbuck" railroad crossing sign. All of the structure, except the pedestal, is high enough so as not to be obscured by the snowbank. The "sawbuck" sign was high enough to be above the sky line. That is, there can be no reasonable contention that it was at all invisible because of a neutral background.

Notwithstanding all that, with no suggestion of diverting circumstance outside the automobile, with midday visibility at or near its best, the Hill sedan was struck by the train and carried some distance east. Further details will come later.

1. There was submitted to the jury the question whether the train speed was so excessive as to be negligent. Stretching the evidence as far as permissible in plaintiff's favor, it does not justify a conclusion that the rate was in excess of 50 miles per hour. (The probability is that it was much less.) In view of the open nature of the crossing and the manner in which it was guarded by warning signs, we hold that, assuming a speed of 50 miles per hour, there was no negligence. The train was to stop at the station 1,770 feet from the crossing.

What is excessive speed of trains in passing over highway crossings depends much upon the character of the crossing itself and the precautions taken to warn travelers of its presence. Lawler v. M. St. P. & S. S. M. Ry. Co. 129 Minn. 506, 152 N. W. 882. Over a crossing as open and well protected as this one, we consider as matter of law that a speed of 50 miles per hour is not negligent. See Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729. In Molden v. M. St. P. & S. S. M. Ry. Co. 160 Minn. 471, 473, 200 N. W. 740; 741, a finding of too much speed was sustained as possibly of "much significance" in the "absence of warnings of a train's approach to a dangerous city or village crossing."

2. The next issue submitted to the jury was whether defendant had failed to warn by proper train signals. Bell or whistle

signals are required by statute. 2 Mason Minn. St. 1927, § 10263. It does not require both. There is here more than the usual amount of so-called "railroad evidence" that the signals were given by both bell and whistle. There is testimony from plaintiff's witnesses as to the whistle.

The bell was actuated by an automatic ringer, which both engineer and fireman say had been turned on about a quarter mile from the stockyards crossing. They say also that the bell continued to ring until the train came to a stop.

There is but a trace of negative testimony as to the bell. One witness for plaintiff was in a position to see the train approach (he was close to the track), but knew nothing of the accident until he heard the crash. He "didn't notice" whether the bell was ringing. He was an ex-railroad man and had heard the "two long and two short" of the crossing whistle. But up to the moment of the crash he had paid no attention to the train and admits that the bell "might have been" ringing. A bright ten-year-old girl was a short distance from the crossing. She heard a whistle before the train got to the interlocking tower. "It whistled again" when "it came up to the tower." She "had not been paying much attention" and so would not say that the bell was not ringing.

It is clear, therefore, and with characteristic candor the learned trial judge concedes as much, that it was error to submit the supposed question whether defendant failed to give the statutory warning signals by bell or whistle. The positive testimony for the affirmative of the issue was not only preponderant—it was compelling. The negative testimony we have mentioned was not sufficient to make the issue one of fact. Lawson v. M. St. P. & S. S. M. Ry. Co. 174 Minn. 404, 219 N. W. 554.

3. It was assumed below that because, when the case went to the jury, defendant requested certain instructions concerning the issue of warning signals, it waived the point that the question should be decided for it as one of law. That was erroneous. By its earlier and timely motion for directed verdict, defendant had

formally urged that the matter be disposed of by peremptory instruction. Having made its position clear, having protected the record by its motion for directed verdict, defendant from then on properly conformed to the rulings of the court. It did not waive anything by so yielding, under proper protest, to adverse rulings, with which it was counsel's duty to comply. E. C. Vogt, Inc. v. Ganley Bros. Co. 185 Minn. 442, 242 N. W. 338.

4. The jury was instructed that it was for them to determine whether it was negligent for defendant not to have "signs, signals, and warnings" in addition to those which protected the crossing. The idea was that, under the rule of Licha v. N. P. Ry. Co. 201 Minn. 427, 276 N. W. 813, this was an extra-hazardous crossing, and so the jury (rather than the railroad and warehouse commission) could determine what was needed in the way of protection. That clearly was error. Under the Licha case, 201 Minn. 427, 276 N. W. 813; Massmann v. G. N. Ry. Co. 204 Minn. 170, 282 N. W. 815, and Sullivan v. Boone, 205 Minn. 437, 286 N. W. 350, this was not an extra-hazardous crossing. Anyway, it was protected by something more than the conventional warnings. In the Licha case there were no Griswold electric signals. They were present here, and it is inconceivable, in view of their efficiency and the other warning devices, that the crossing could be considered other than protected to the utmost extent required by reasonable care. We do not overlook the fact that No. 61 is a busy trunk highway and that somewhere between 10 and 20 trains pass this crossing daily. That circumstance probably explains why the railroad and warehouse commission ordered, or defendant, with its consent, installed, the Griswold signs.

5. Also sent to the jury was the question whether the flashing signals were working. There is compelling evidence that they were. Witnesses in nowise connected with defendant said that they were. The young girl who testified for plaintiff was one of them. The argument *contra* is that this testimony is in the main, if not altogether, confined to the signal south of the track and east

of the highway. The idea is that there is no positive testimony that the similar signal on the other side, the one facing the Hill automobile, was also working. Both signals were on the same electric circuit. So, if one was operating, the only reasonable inference is that the other must have been also. The evidence taken as a whole permits no other conclusion. The issue should not have gone to the jury.

6. From his position on the left side of the locomotive cab, the fireman saw the Hill automobile. He estimated that when he first saw it the locomotive was 150 feet and the automobile 200 feet from the crossing. The automobile was not going overly fast. The fireman said that he "expected" it to stop. There is no reason why he should have anticipated otherwise, until it so appeared. When it did, he shouted to the engineer for an emergency stop. The air brakes were instantly applied, and, in railroad parlance, the train was "dynamited." But it was too late.

Trainmen are not required to assume, when seeing an automobile approaching a crossing, that its driver will be grossly negligent or motivated by a desire for self-destruction or homicide. On the contrary, they may reasonably assume that the vehicle will halt before getting into a position of danger. They are not required to assume otherwise until, in the exercise of reasonable care, they should apprehend danger. Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729. There is no evidence from which a reasonable inference could be drawn that the fireman was negligent in not apprehending that the Hill car would proceed onto the crossing, notwithstanding the approach of the obvious and noisy train, which must have been thrown into bold relief against the winter background. It was the statutory duty of the driver of the Hill car to stop not less than 10 feet from the nearest rail. 3 Mason Minn. St. 1938 Supp. § 2720-212. Disobedience of the statute is a misdemeanor. *Id.* § 2720-281.

From the foregoing, it appears that defendant's motion for a directed verdict should have been granted. It was error to deny its motion for judgment notwithstanding. In consequence, there

must be a reversal of the order with directions to enter judgment for defendant.

So ordered.

GALLAGHER, CHIEF JUSTICE (dissenting).

I am not willing to go so far as to say that, as a matter of law, it was not negligent to operate a train over the crossing in question at a speed of 50 miles per hour. In many respects the facts involved are similar to the facts in Molden v. M. St. P. & S. S. M. Ry. Co. 160 Minn. 471, 200 N. W. 740, where the question of the reasonableness of defendant's speed was held to be one of fact for the jury. In each instance the track passed through a village of about 700 population; the accident occurred in the daytime; the driver of the automobile had about the same view in the direction from which the train was approaching; the crossing was a much used crossing. Favorable to defendant's version in the instant case is the fact that more adequate warning signs were located at the crossing than were shown to exist in the Molden case. On the other hand, however, the accident in the Molden case occurred in the summer, while the one in the instant case occurred in the winter when the ground and surroundings were covered with snow. In the Molden case the highway crossed the track in a clear-cut manner, while in this case the highway takes an irregular jog at the railroad crossing.

Taking everything into consideration, it seems to me that the question as to whether the train was traveling at an excessive rate of speed under all of the existing conditions was one of fact for the jury. That being so, judgment notwithstanding the verdict should not be granted.

PETERSON, JUSTICE (dissenting).

I concur in the dissent of Mr. Chief Justice Gallagher.