ALFRED OHRMANN v. CHICAGO AND NORTH WESTERN RAILWAY COMPANY AND ANOTHER.[1]

May 23, 1947.

No. 34,308.

[1]Reported in 27 N. W. (2d) 806.

*Alfred E. Rietz, James K. Rietz,* and *Nye F. Morehouse,* for appellant.

*F. J. O'Brien* and *John Ott,* for respondent.

There was no appearance in this court on behalf of defendant Darrell Mosher.

MATSON, JUSTICE.

Defendant railroad appeals from an order denying its motion for judgment *non obstante* or a new trial.

The collision which resulted in plaintiff's injuries occurred on the main line of the railroad at a crossing at Havana, an unincorporated village about seven and one-half miles west of Owatonna. Havana, which has no depot, consists of six or seven residences, a creamery, a coal shed, and a store. Parallel to the main line of the railroad and about 89 feet to the north is trunk highway No. 14. The crossing in question is that of a graveled county road, running north and south, which intersects the aforesaid main line at an angle of about 20 degrees less than a right angle. South of the main-line tracks and east of the county road, in the 70-degree angle made by the intersection of such tracks and the road, is a creamery building. Between the creamery and the main line is a railway spur for the loading of creamery products. The western terminus of this spur is just off the east side of the county road; from thence it extends east approximately parallel to the main line for a distance of about 350 feet, and then the spur deviates northeasterly until it connects with the main line at a switch stand 595 feet east of the crossing. The distance between the parallel portions of the main line and the spur

from inside rail to inside rail is 38.7 feet. The rails of each track are 4 feet 8¼ inches apart. The creamery stands parallel to the county road and at an angle to the railway tracks. The distance between the south rail of the spur tracks and the northwest corner of the creamery is 33 feet, and with respect to the northeast corner of the building the distance is reduced to 18.3 feet. At the time of the accident, a refrigerator car about 42 feet long and 9 feet 11 inches wide was located on the spur track opposite the creamery for loading. Ignoring the spur track and the refrigerator car, we have, looking east from the county road, an opening or angle of vision about 76 feet wide between the main line and the northwest corner of the creamery, and this space tapers to a width of about 60 feet at the northeast corner. In addition to this angle-of-vision space, we have the main line roadbed itself. Partially obstructing the easterly view, in addition to the refrigerator car, were three power-line poles. One was located near the terminus of the spur track, and the other two were located between the boxcar and the main track. Sixteen feet south of the center of the main track on the east side of the county road is a cross-buck railroad crossing sign, and to the post thereof below the crossarms is attached a stop sign. Illustrative of the extent of the unobstructed easterly view of the main line (except as interrupted at various points by the refrigerator car and the power-line poles) from the county road between the creamery and the crossing is the fact that a person standing on the center line of the road at a point 41 feet south of the center of the crossing can look down the track to the east a distance of 1,045 feet or to a point where the track enters a cut through an embankment. If such person were to stand on the county road 66 feet south of the crossing, his vision would extend to a point on the main line 958 feet east of the crossing. This data as to the nature of the location is to be judged from the standpoint of plaintiff, who was approaching the crossing while riding in a truck which was being driven in a northerly direction along the county road.

Defendant Mosher has not appeared in opposition to this appeal and will be hereinafter referred to simply as Mosher, and the term

defendant will be used to indicate only the appealing defendant, the railway company.

On the morning of December 22, 1944, plaintiff, together with one DeBolt and Mosher, as employes of the Steele County Creamery Association, brought a truckload of butter from Bixby to the Havana creamery, where it was unloaded. While they were unloading the butter and doing certain work inside the creamery, the refrigerator car was placed on the spur opposite the loading door on the north side of the building. About 11:20 a. m., when they had finished their work, they reëntered the cab of the truck preparatory to going to Owatonna to eat lunch and to obtain repair parts for a conveyor. Mosher, as owner and driver of the truck, sat on the left side, with plaintiff seated in the middle and DeBolt on the right. They drove from in front of the creamery onto the county road and then proceeded north to go across the tracks to reach trunk highway No. 14. In passing over the tracks, the rear end of the truck was struck by a westbound passenger train. The truck was demolished, and plaintiff was injured.

Plaintiff's suit is based on the alleged negligence of Mosher in failing to stop at the crossing, as well as on the alleged negligence of defendant in operating its train. Plaintiff specifically alleged that defendant was negligent (1) in operating its train at an excessive speed; (2) in the failure of the engineer and the fireman to keep a proper lookout; (3) in the failure to keep the train under proper management and control; and (4) in the failure to sound proper warning signals. At the close of the evidence defendant moved for a directed verdict upon the ground, among others, that no negligence had been shown. This motion was denied, and the court submitted all issues to the jury under a general charge of negligence. The jury returned a general verdict against defendant and also against Mosher. Thereupon defendant moved the court that the verdict, with respect to defendant, be set aside and that it be granted judgment *non obstante* or a new trial. From the order denying this latter motion, we have this appeal.

■ Where several issues of fact are tried and any one of them is erroneously submitted to the jury and a general verdict is returned for plaintiff, defendant is entitled to have the verdict set aside and to have a new trial, unless it conclusively appears as a matter of law that plaintiff was entitled to the verdict upon other grounds. The verdict was general. If there was insufficient evidence to support a finding of negligence against defendant with respect to any of the issues of fact, it was error to submit such issue to the jury, and there must be a new trial, because it is impossible to say whether the verdict was based upon an issue which was properly submitted or upon an issue improperly submitted. Vasey v. Saari, 141 Minn. 103, 169 N. W. 478; Lindemann v. C. R. I. & P. Ry. Co. 154 Minn. 363, 191 N. W. 825; Berg v. Union State Bank, 186 Minn. 529, 243 N. W. 696; Cavallero v. Travelers Ins. Co. 197 Minn. 417, 267 N. W. 370; Roth v. Swanson (8 Cir.) 145 F. (2d) 262; 5 Dunnell, Dig. & Supp. §§ 7168, 7174. We turn to an examination of the record.

■ Defendant's request that the jury be instructed that there was no evidence to support a finding that the speed of the train was so high as to be negligent was denied. In the case of Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 38-39, 279 N. W. 729, 730-731, in refusing to find that a speed of 40 miles per hour at a crossing constituted negligence as a matter of law, we cited with approval and quoted from the case of Haller v. Pennsylvania R. Co. 306 Pa. 98, 103-104, 159 A. 10, 12, to the effect that:

"A speed of 40 miles an hour is *not sufficient by itself* or when associated with any fact or facts present in this case to support a finding of negligence. *Before the question of speed at a crossing can be submitted to a jury, it must be in evidence that the speed testified to was greater than was usual at that place or that special circumstances existed there at that time and were known or should have been known to the defendant or its servants which rendered necessary a lower speed at that point.* * * * If railroads must, in order to escape the charge of negligence, moderate the speed of their trains to less than 40 miles an hour at every crossing where vehicles are likely to pass frequently, there would be few if any railroad cross-

ings where this slackening of speed would not be required, and yet such a rule would be inconsistent with the requirements of modern transportation." (Italics supplied.)

Here, there was some testimony that the train was going only 50 miles per hour. One eyewitness who was some distance away thought it might have been going as high as 65. Taken as a whole, however, the testimony indicates that the train was traveling at its usual and customary speed of approximately 60 miles per hour. What is excessive speed of trains in passing over highway crossings depends much on the character of the crossing itself and the precautions taken to warn travelers of its presence. Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579, 154 A. L. R. 206. Here, we have an open crossing that is visible to the crew of an approaching train for at least 1,000 feet. Likewise, operators of motor and other vehicles have the same open and distant view for observing the approach of trains. The crossing is located in a small village, where the traffic is very light and there is little to obstruct the view. It is equipped with a plainly visible cross-buck and stop sign as required by order of the railroad and warehouse commission, and there is nothing about it to indicate a reasonable need for the taking by defendant of any additional precautions in the interest of public safety. Munkel v. C. M. St. P. & P. R. Co. 202 Minn. 264, 278 N. W. 41. It is true that between the creamery building and the main track the view of an occupant of a moving motor vehicle would momentarily be cut off by the refrigerator car and by certain power-line poles, but these momentary obstructions to the eye cannot reasonably be held to constitute a material factor in affecting the view to be had of a train approaching, as here, over a straight track upon level ground. The refrigerator car on the creamery loading spur was not so near to the main line as to create temporarily a blind crossing. There were no distracting circumstances to throw a driver or occupants of road vehicles off their guard. It was broad daylight, and the atmosphere was clear and favorable to a high degree of visibility. There was no ice or snow on the rails. Particularly appropriate to

the facts herein is the observation of the court in the Roth case (145 F. [2d] 267) :

"The crossing was not a blind crossing nor an extrahazardous one requiring gates or other safeguards. Lawson v. Minneapolis, St. P. & S. S. M. R. Co., 174 Minn. 404, 406, 219 N. W. 554, 555. It was a crossing with which the driver of the automobile was entirely familiar. It was not equipped with gates or other devices to signal the approach of trains, but had the usual cross-buck crossing sign. It was a dangerous crossing only in the sense that all such railroad grade crossings are dangerous."

Taking into consideration the nature of the railroad crossing as involving a location in a sparsely settled community that is singularly free from traffic congestion and as affording to travelers proceeding on the highway in the exercise of reasonable care a clear and substantially unobstructed view of approaching trains for a distance of upward of 1,000 feet in either direction over a straight and level track, and taking into further consideration the absence of special circumstances creating a hazard at the time which was or should have been known to defendant or its servants, a usual and normal speed of 60 miles per hour *does not of and by itself* justify a submission to the jury of the issue of high speed as a basis for a finding of negligence. As we said in Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729, the situation here presented is not that of a dangerous crossing like the one in Hendrickson v. G. N. Ry. Co. 49 Minn. 245, 51 N. W. 1044, 16 L. R. A. 261, 32 A. S. R. 540, nor that of a fog or smoke which obscures the view of travelers as in Atlantic Coast Line R. Co. v. McKinley (5 Cir.) 84 F. (2d) 33, or in Munkel v. C. M. St. P. & P. R. Co. 202 Minn. 264, 278 N. W. 41. Under the circumstances, it was error to submit the issue of speed to the jury.

■ The trial court erroneously refused to instruct the jury that there was no evidence to justify a finding that a proper lookout had not been maintained by the engine crew. The uncontradicted evidence is that both the fireman and the engineer were at all times attentively watching the track ahead. The engineer, from his position on the right-hand side of the engine, could not see objects ap-

proaching from the left or the south. The fireman, however, occupied his regular position on the left side and could and did see the Mosher truck approaching. When he first saw the truck in the line of vision between the creamery and the refrigerator car, the train was about 300 or 400 feet east of the crossing. There was nothing to indicate that the vehicle would not stop. It was being driven at a slow speed. The fireman estimated its speed at 10 to 15 miles per hour as it passed between the spur and the main track. Mosher said he was not going over seven or eight miles an hour and that he "hesitated at the crossing," but did not stop before attempting to pass over. Plaintiff thought the speed was only three or four miles per hour. Whatever rate of speed is adopted, clearly the truck was being driven slowly and not in a manner indicative of an intention not to stop. The train was only 100 to 150 feet from the crossing when it first became apparent that the truck would not stop. The fireman was under no duty to notify the engineer of the approach of the truck to the crossing until such time as it became apparent that the driver was not going to stop and that a collision was imminent. Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579, 154 A. L. R. 206; Roth v. Swanson (8 Cir.) 145 F. (2d) 262. The fireman expected the truck to stop, and there is no reason why he should have anticipated otherwise until the contrary became apparent. When it did become apparent that the truck was not going to stop, he immediately shouted an appropriate warning to the engineer. It is difficult to perceive what more he or the engineer could have done in maintaining a proper lookout.

■ Closely connected with the issue of the maintenance of a proper lookout is the issue of whether the train was kept under proper management and control. This issue was also submitted to the jury. When the engineer was warned by the fireman that the truck was not going to stop and that a collision was imminent, the uncontradicted testimony is that he instantly shut off the throttle and gave the brakes their full emergency application. All that could reasonably be done was done, and merely because the efforts to avoid a collision were fruitless will not alone indicate negligence.

No duty is imposed on railroads to slow down at every crossing where a truck is seen approaching. On the contrary, from the very nature of the type of vehicles, it is the duty of the operator of the truck to slow down and stop when he approaches a crossing.

"* * * A train cannot make the time expected and demanded by the public if it slows down whenever a vehicle is seen at or approaching a crossing. It is the duty of the driver of the vehicle to yield the right of way and to take such precautions as, under the circumstances, may be reasonably necessary to avoid a collision. Not until it becomes apparent to the engineer that a collision is imminent is he required to stop his train." Asklund v. C. G. W. R. Co. 176 Minn. 214, 218, 223 N. W. 95, 96.

"* * * Railroad trains at grade crossings have the right of way. Their momentum and ponderosity require that more easily controlled vehicles yield their equal right to the use of the crossing until the train has passed." Hoyum v. D. W. & P. Ry. Co. 203 Minn. 38, 279 N. W. 730.

The acts of the crew here after noticing the truck cannot be said to be negligent. They have no duty to anticipate that the driver of an approaching truck will ignore a stop sign and recklessly rush into the path of an onrushing train. The crew may properly assume that the driver will exercise care and stop, and they need not themselves stop or reduce their speed until it becomes apparent to them that the driver will not stop. Here, when the danger became obvious the crew did all possible to stop the train. No negligence or want of care on their part was shown.

Under direct examination the engineer indicated that the locomotive was equipped with a "sander." No additional testimony whatever was given by any witness as to the purpose of the sander or to indicate whether or not, under the circumstances here existing, its use would have reduced the speed of the train more rapidly. The evidence shows that the rails were entirely free of ice and snow. We also have the fact that the train, after the emergency brakes had been applied, traveled approximately 1,600 feet before coming to a stop. It is inconceivable, even if the sander had been used, assum-

ing that its use on dry rails would have proved efficacious in some small degree, that it would have had any appreciable effect in reducing the speed of a train going 60 miles an hour when the object of the collision, at the time the fireman notified the engineer of the immediacy of the danger, was only 100 to 150 feet away. Taking into consideration the time necessary to apply the brakes and all the other circumstances here existing, a finding of negligence cannot be predicated on a failure to use the sander, and no reference should have been made to its use in any argument to the jury.

■ The issue as to whether the proper warning signals were sounded was properly submitted to the jury. The evidence is conflicting. The fireman and the engineer asserted positively that the whistle was sounded at the whistling post some 1,300 feet to the east of the crossing and three times thereafter, the last blast being sounded immediately before the collision and merging into the sound of the crash. The brakeman heard a blast of the whistle at the whistling post and once again later. In opposition to this testimony is that of plaintiff, who heard no sound of a whistle until the train was bearing down upon the truck. Mosher did not hear either bell or whistle until he had actually entered the crossing. The baggageman in the second car to the rear of the engine heard the whistle first when the emergency brakes were applied. Deml, a customer at a store located one-half to one block away from the crossing, was just coming out of the store and was in the act of walking to his truck parked a few feet away when he heard the sound of the onrushing train and the crash that followed. He heard no sound of either a whistle or a bell. Two housewives who were inside nearby residences with the doors and windows closed each heard only one whistle blast just before the collision. Other witnesses situated under varying circumstances as to the opportunity and likelihood for hearing signals heard nothing. Obviously, some of these witnesses were scarcely in a position to hear effectively; nevertheless, as to some of them, we have a sufficient conflict of pertinent testimony to present a question of fact for determination by the jury.

In Cotton v. Willmar & Sioux Falls Ry. Co. 99 Minn. 366, 368, 109 N. W. 835, 836, 8 L.R.A.(N.S.) 643, 116 A. S. R. 422, 9 Ann. Cas. 935, we held:

"The allegation being that the bell was not rung it was competent to prove the negative fact by the *testimony of competent witnesses who were so situated that they might, and probably would, have heard the sound had the bell been rung.* * * * Therefore when it is sought to prove the nonexistence of sound by the testimony of witnesses the conditions essential to the competency of the evidence must be supplied. *The probative value to be given to the fact that a witness did not hear the sound depends upon the condition of his senses, his proximity to the place, the degree of attention, and other such circumstances which render it more or less probable that, if the sound had been made, the witness would have heard it.* * * * The degree of attention will affect the value of the evidence, but the fact that the witness was not giving his direct attention at the time for the purpose of learning whether signals were given will not destroy the value of the evidence if he was present at the crossing, was conscious, and in the possession of his ordinary senses, and testifies positively that he heard no signal. * * * The position and situation of the witnesses, the attention they were giving, and their credibility, and the weight of the evidence are questions for the jury." (Italics supplied.)[2]

■ Defendant's contention that plaintiff is guilty of contributory negligence as a matter of law is without merit. One riding in a vehicle without any right of control over the driver's management

[2]See, Polchow v. C. St. P. M. & O. Ry. Co. 199 Minn. 1, 4, 270 N. W. 673, 674; Setosky v. Duluth, S. S. & A. Ry. Co. 173 Minn. 7, 8-9, 216 N. W. 245, 246; Fink v. N. P. Ry. Co. 162 Minn. 365, 367-368, 203 N. W. 47, 48; Willett v. G. N. Ry. Co. 154 Minn. 10, 12, 191 N. W. 260, 261; Zenner v. G. N. Ry. Co. 135 Minn. 37, 39, 159 N. W. 1087, 1088; Lawler v. M. St. P. & S. S. M. Ry. Co. 129 Minn. 506, 508, 152 N. W. 882, 883; cf. Union P. R. Co. v. Burnham (10 Cir.) 124 F. (2d) 500, 502; Roth v. Swanson (8 Cir.) 145 F. (2d) 262; Annotation, 98 A. L. R. 161, 167; 44 Am. Jur., Railroads, § 622; 2 Wigmore, Evidence (3 ed.) § 664; 2 Dunnell, Dig. & Supp. § 3238; 5 Dunnell, Dig. & Supp. § 8175.

thereof is not chargeable with the driver's negligence when such negligence concurs with that of a third person to cause injury to the rider. Molden v. M. St. P. & S. S. M. Ry. Co. 160 Minn. 471, 200 N. W. 740. The primary duty of managing the truck with safety rested upon Mosher. There was nothing in Mosher's conduct as a driver to indicate to plaintiff that he was unaware of the railroad crossing and its attendant dangers or that he would not take proper precautions by stopping before proceeding across the track. Seated as plaintiff was between Mosher and DeBolt, there was little that he could do in a fleeting moment of time to effect a change in the driver's course of action or to take any other practical steps for the preservation of his own safety. The issue of contributory negligence was properly a matter for the jury's determination. 4 Dunnell, Dig. & Supp. § 7038, and cases cited therein.

Since certain issues of fact were erroneously submitted to the jury, a new trial must be granted. The order of the trial court is reversed and a new trial granted in accordance with this opinion.

Reversed.

---

[1]Reported in 27 N. W. (2d) 813.