ALBERT SCHROHT, TRUSTEE FOR NEXT OF KIN OF
MARLOWE E. SCHROHT, AND ANOTHER v.
LEONA VOLL AND ANOTHER.
CHICAGO & NORTHWESTERN RAILWAY COMPANY,
APPELLANT.[1]

June 17, 1955.

Nos. 36,518, 36,519, 36,520.

[1]Reported in 71 N. W. (2d) 843.

*Warren Newcome, Gerald F. Fristensky, George H. Henke,* and *Drennan J. Slater,* for appellant.

*Plunkett & Plunkett,* for respondent Voll.

*Byron J. Casey* and *Nelson, Casey & Tripp,* for respondent Schroht.

*James K. Rietz,* for respondent Eschenbach.

MATSON, JUSTICE.

Defendant railroad, in two wrongful death actions, appeals from an order in each action denying its alternative motion for judgment or a new trial and from an order in one action denying the other defendant's alternative motion for a reduction of the verdict or a new trial. These actions were consolidated for trial and heard together on appeal.

These actions are brought by trustees to recover for the alleged wrongful deaths arising out of a collision between a northbound truck in which the decedents were riding and a westbound passenger

train of the Chicago & Northwestern Railway Company at a crossing at Meriden, an unincorporated village. On January 23, 1953, at about 10:40 a. m., Arnold Voll was driving his truck northward through Meriden, Minnesota, at an estimated speed of from 15 to 20 miles per hour. Harold Lewison and Marlowe Schroht were passengers in his truck. It was a cloudy day, but visibility was good. The road upon which the truck was proceeding runs generally north and south. The railroad track crosses the road at approximately right angles, running generally east and west. Along the east edge of the road, some 335 feet south of the point where the track intersects the road, there is located an advance warning railroad sign. Eighteen feet south of the center of the track on the east edge of the road is a cross buck railroad crossing sign to which is attached a stop sign. The railroad was operating one of its westbound passenger trains over the tracks at a speed which was estimated to be between 30 and 60 miles per hour, depending on the testimony of the particular witness whose testimony is selected. The train, which consisted of a Diesel engine and six cars, was late. The train crew testified that the whistle had been sounded from the whistle post, which is located about 80 rods east of the crossing, and at intervals to the crossing.

South of the railroad track and at different distances east of the road are located a warehouse, grain elevator, and a lumberyard which partially obstruct, for motorists approaching from the south, the easterly view of approaching trains. The approach to the crossing is practically level in grade with the surrounding terrain. A motorist approaching the crossing from the south has the following unobstructed views to the east: At 100 feet south of the crossing, one can see 249 feet to the east along the track; at 75 feet south, 282 feet to the east; at 50 feet south, 379 feet to the east; and at 25 feet south, over 2,000 feet east. The fireman, who was keeping a lookout to the west and south along the road, testified that, just as the locomotive cleared the elevator, he first observed the northbound truck about 80 feet south of the crossing. The elevator building, which the locomotive had then cleared, is located some 175 feet east of the crossing, south of the track. Shortly after the fireman

saw the approaching truck, he testified, he told the engineer of that fact. However, the engineer claimed that he had not heard the fireman's statement, apparently since the whistle was being sounded at that time. But whatever the reason may be for the engineer not having heard the warning, *the fireman gave the warning only to insure continued whistling.* The fireman assumed the truck was going to stop for the crossing even after giving this warning. When, however, it became apparent that the truck was not going to stop and that a collision was imminent, the fireman yelled to the engineer to stop. Then the locomotive was only 25 to 30 feet from the crossing. The engineer quickly applied the service brakes but he did not put the brakes in emergency until the locomotive hit the truck. Even then, the brakes were not put on full emergency, since the impact of the collision broke the air brake pipe on the front end of the locomotive. As a result, the brakes were kept from going into operation on the front six wheels of the locomotive. Not until the train had proceeded about 1,300 feet west of the crossing did it finally stop. The driver and the two passengers of the truck were killed instantly from the collision.

The road had been sanded at least 30 to 40 feet south of the point at which the railroad track intersected it. There was no evidence that any attempt was made by the truck driver to stop at the crossing. In fact, the only skid marks were those which extended in a westerly direction, apparently caused by the engine pushing the truck westward after the collision. It was evident from the skid marks that the front wheels of the truck had advanced north of the north rail of the tracks.

Plaintiffs' actions are based on the alleged negligence of the truck driver in failing to stop at the crossing, as well as the alleged negligence of defendant railroad (1) in operating the train at an excessive speed, (2) in failing to keep the train under proper management and control, and (3) in failing to sound proper warning signals.

The trial court instructed the jury that the driver of the truck was negligent as a matter of law, that such negligence was a proximate cause of the accident, and that there was no evidence in the record upon which to base a finding of contributory negligence on

the part of the passengers. As to the defendant railroad, the trial court submitted the case to the jury on the allegations of negligence. The jury returned a general verdict against the railroad and the administratrix of the truck driver in favor of each of the trustees of the two passengers of the truck for $17,500. The trial court denied defendant railroad's motion for judgment notwithstanding the verdict or a new trial in each case and the other defendant's alternative motion for a reduction of the verdict or a new trial in one case. Defendant railroad appeals from the orders denying the above motions.

■ "Where several issues of fact are tried and any one of them is erroneously submitted to the jury and a general verdict is returned for plaintiff, defendant is entitled to have the verdict set aside and to have a new trial, unless it conclusively appears as a matter of law that plaintiff was entitled to the verdict upon other grounds."[2] The reason for requiring the new trial is the impossibility of knowing whether the general verdict was based upon an issue which was properly submitted or upon an issue which was improperly submitted. In the instant case, it does not appear that the verdict is right as a matter of law on one or more of the issues. Therefore, it becomes necessary to determine whether there was insufficient evidence to support a finding of negligence against defendant with respect to any of the issues submitted.

■ With respect to the issue of excessive speed, we have stated that, before the issue of train speed at a railroad crossing can be submitted to the jury, there must be evidence either that the speed was greater than was usual at that place, or that special circumstances existed[3] which were known or which should have been known to the railway company making a lower speed necessary at that

---

[2]Ohrmann v. Chicago & N. W. Ry. Co. 223 Minn. 580, 585, 27 N. W. (2d) 806, 809; Anderson v. Birkeland, 229 Minn. 77, 38 N. W. (2d) 215; 14 Dunnell, Dig. (3 ed.) § 7174.

[3]See Hoyum v. Duluth, W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729, wherein it is held that a slippery highway, even when known to the engineer, is not a ground for reducing train speed.

point.[4] Here, the defendant railroad through its employees admits that the usual speed of this train through Meriden was 35 miles per hour or slower. There was considerable testimony that the train was going substantially faster than 35 miles per hour through Meriden on the day of the collision. In fact, there was testimony that the train was going 60 miles per hour at the time of the accident. The evidence was conflicting. Thus, the weight of the evidence and the credibility of the witnesses were properly questions to be determined by the jury.

The defendant railroad contends that, even assuming the speed at the time of the collision was in excess of the usual speed at that point, the excessive speed could not have been the proximate cause of the collision. We cannot agree. In the light of the fact that the front wheels of the truck had advanced beyond the north rail of the tracks at the time of the collision, the jury might reasonably have concluded that the truck driver was misled in appraising his chances of crossing the track in safety and that had the speed not been excessive the fatal accident would not have occurred. Thus, it cannot be held as a matter of law that the truck driver's failure to stop at the crossing was the sole proximate cause of the collision. The jury could reasonably have found that the negligence of the truck driver and the defendant railroad concurred in causing the deaths of the two passengers of the truck.[5] In other words, the negligence of the defendant railroad in operating its train at an excessive speed could reasonably be found to have been operative until the collision occurred.[6] It was for the jury to determine whether the truck driver's negligence was an intervening superseding cause of the

---

[4]Cameron v. N. P. Ry. Co. 234 Minn. 355, 48 N. W. (2d) 540; Ohrmann v. Chicago & N. W. Ry. Co. 223 Minn. 580, 27 N. W. (2d) 806; Hoyum v. Duluth, W. & P. Ry. Co. *supra;* Haller v. Pennsylvania R. Co. 306 Pa. 98, 159 A. 10.

[5]See, Molden v. Minneapolis, St. P. & S. S. M. Ry. Co. 160 Minn. 471, 200 N. W. 740; 13 Dunnell, Dig. (3 ed.) § 7006.

[6]See, Krtinich v. Duluth, M. & I. R. Ry. Co. 206 Minn. 106, 287 N. W. 870.

collision.[7] Therefore, we find no error in the trial court's submission of the issue of excessive speed to the jury.

■  The issue as to whether the train was kept under proper management and control was improperly submitted to the jury. Trainmen may reasonably assume that the vehicle approaching a crossing will stop before getting into a position of danger. "They are not required to assume otherwise until, in the exercise of reasonable care, they should apprehend danger."[8] Thus, the fireman was under no duty to notify the engineer of the truck's approach until it became apparent that the driver was not going to stop and that a collision was imminent.[9] The fireman testified that he expected the truck to stop, and there is no reason why he should have expected otherwise until the contrary became apparent. The truck was proceeding at a relatively slow speed of from 15 to 20 miles per hour. It was not driven in a manner indicative of an intention not to stop. The uncontradicted testimony is that, when it became apparent that the truck was not going to stop for the crossing, the fireman immediately commanded the engineer to stop. The engine was then only 25 to 30 feet from the crossing. *The train was then so close that all efforts of the engineer would not have avoided the collision.*[10] Under these circumstances, the fact that the brakes were not put on full emergency cannot be regarded as negligence which proximately caused the deaths since the collision had occurred before the engineer put the brakes on emergency at all. The same can be said for the train's failure to stop sooner than 1,300 feet west of the crossing. Although the record contained work reports on the condition of the engine in question after, and a day before, the collision, there was

[7]See, Miller v. Union Pac. R. Co. 290 U. S. 227, 54 S. Ct. 172, 78 L. ed. 285; 13 Dunnell, Dig. (3 ed.) § 7005; Prosser, *The Minnesota Court on Proximate Cause,* 21 Minn. L. Rev. 19, 37.

[8]Engberg v. G. N. Ry. Co. 207 Minn. 194, 200, 290 N. W. 579, 583, 154 A. L. R. 206; Ohrmann v. Chicago & N. W. Ry. Co. *supra;* Asklund v. Chicago G. W. R. Co. 176 Minn. 214, 223 N. W. 95.

[9]Ohrmann v. Chicago & N. W. Ry. Co. *supra;* Asklund v. Chicago G. W. R. Co. *supra.*

[10]Krtinich v. Duluth, M. & I. Ry. Co. 206 Minn. 106, 287 N. W. 870; Hoyum v. Duluth, W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729.

no evidence that the engine was working improperly at the time of the accident. In fact, the engineer's testimony was that the engine was working properly in all respects. Whatever mechanical deficiencies are shown by the reports and whatever evidence of improper management and control by the crew is in the record, there is no evidentiary basis for a finding that any mechanical defects or improper management was a proximate cause of the collision.

■ The trial court erroneously refused to instruct the jury that there was no evidence to justify a finding that proper warning signals were not sounded. A bell or whistle signal is required by statute to be sounded at least 80 rods from a crossing and at intervals until the crossing is reached.[11] It is to be noted that the statute does not require both.[12] In deciding one of these issues we must consider the evidence as a whole because not every conflict of evidence creates a question for the jury.[13]

In this case, no witness testified that he did not hear the whistle sound. There was positive evidence that the whistle was sounded intermittently from the whistling post, which is located about 80 rods east of the crossing, until the time of the collision. The fireman and the engineer testified that the whistle was sounded at the whistle post and continued until the crossing was reached.

The conductor, when asked how close he was to Meriden when he gave the engineer an air signal to stop at Waseca, testified that the train was then approaching or passing the depot (located about 500 feet east of the crossing) and that he then heard the *last* long blast of the train whistle. He said that was when he *first* heard the whistle. His testimony, *when taken as a whole,* shows that he was riding in a coach four or five car lengths behind the engine and that while he was inside the coach it was difficult for him to hear train signals because of air conditioning, storm windows, and double doors. Preparatory to giving the engineer the air signal, he had stepped into the vestibule between cars so that he could hear the ending of the whistling for the crossing and be ready to give his air

[11]M. S. A. 616.34.
[12]Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579.
[13]Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637.

signal immediately thereafter. He also said he had heard a long whistle for the town. His testimony, though bordering on ambiguity in answering certain questions, provides no basis for a finding that the proper signals were not given.

The brakeman on the train also testified that he heard the train sound the usual crossing whistle of two longs, a short, and a long blast. Mr. H. W. Olson, the elevator operator, testified that he heard the whistle several times. He estimated the whistle had been sounded about a quarter of a mile east of the crossing. He was quite sure that it also whistled when west of the elevator. The banker of Meriden, who was waiting on a customer at the time of the collision, testified that he heard several whistles.

Now we shall consider the testimony of other witnesses. For instance, Wilbert H. Schroeder, a farmer, who was pumping air into his tires at a garage about 200 feet south of the crossing, testified that he heard the whistle sounded between the elevator and the crossing. But a few sentences later he testified that he "didn't notice" whether it was blown when it was east of the elevator or whether it was blown "after it came out from behind the elevator." Mr. Donald C. Brown, who was a passenger in a coach to the rear of the train and who was occupied in reading, testified that he definitely heard the whistle at least once and "There may have been a series of toots." Mr. Leo Thompsen, who was upstairs in his grocery store at the time of the collision, testified that he heard the train whistle, looked outside, and saw the collision; but he did not hear the train whistle east of the crossing. Yet, in response to the question of how many blasts of the whistle he heard, he replied that he didn't know. Mr. Walter Voss, whose place of business is about 300 feet south of the railroad track, testified that he didn't remember whether the whistle was blowing when the train passed between the lumberyard and the elevator. Mr. Arthur Willert, who was waiting on a customer in the office and hardware building of the lumber company, stated that he heard the train blow its whistle as it came from behind the lumber building which is located about 600 feet east of the crossing on the south side of the track. None of these witnesses undertook to testify unequivocally that the train whistle was

not blown; in fact, none unequivocally testified that the train whistle was not blown more than once or was not blown at the whistle post.

In the light of our analysis of the sounding of the whistle, it will not be necessary to review the evidence as to the ringing of the bell since the statute states that one or the other will suffice. In this case there was no evidence negative in form and affirmative in substance that could support a finding that the warning signals were not given.[14] The testimony merely varied in its positiveness as to the number of blasts that were given and where they were given. In the light of the overwhelming, convincing, and compelling testimony of defendant's employees *as corroborated by several disinterested witnesses,* the testimony of the witnesses who heard only one whistle could not be reasonably accepted as the basis for a finding of negligence in failing to give the warnings required by the statute.[15]

■■■ Defendant railroad contends that a verdict of $17,500 is excessive in the wrongful death action brought on behalf of the next of kin of Marlowe Schroht who was 18 years old at the time of the accident. The matter of granting a new trial for excessive damages rests in the discretion of the trial court.[16] Unless there is a clear abuse of discretion, this court will not reverse the trial judge.[17] The facts of the instant case provide a sufficient basis to sustain the damages awarded by the jury. Decedent Marlowe Schroht according to the testimony was an honest, conscientious, dependable young man of 18. He worked several nights after school for neighbors. He sang at weddings and funerals in the community. His parents operated a farm on which there was considerable indebtedness. Marlowe was very interested in farming and had given his parents a large amount of help. He had made plans to go into partnership with his father in raising hogs. The jury could reasonably find that he would have remained loyal to his parents and would have helped them considerably. The reasonableness of the verdict is not to be tested by a yardstick applicable to all cases since the peculiar facts of each

[14]See, Forde v. N. P. Ry. Co. 241 Minn. 246, 63 N. W. (2d) 11.

[15]Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579.

[16]See, 14 Dunnell, Dig. (3 ed.) § 7133.

[17]See, 14 Dunnell, Dig. (3 ed.) § 7136.

case must be considered and weighed in the light of such variables as the decedent's character, health, habits, talents, prospects, earnings, and parental contributions.[18] The record indicates that this case was fairly tried without passion and prejudice created by the parties or their counsel. Thus, under all the circumstances here existing, we cannot say that the verdict was excessive.[19] The trial court's statement in its instructions that the jury might consider the future contribution which "these two decedents would have contributed to their families" is regarded by this court under the circumstances to have been an unintentional misstatement with respect to decedent Marlowe Schroht because his next of kin were his father and mother, not his brothers and sisters. However, since there was no objection thereto before the jury retired, defendant railroad is precluded from raising the point now.[20]

Reversed and remanded for a new trial on the sole liability issue of whether the defendant railroad was negligently operating its train at an excessive speed at the time of the collision and whether such negligence was a concurring cause of the accident.

Reversed and remanded.

---

[18]See, Thoirs v. Pounsford, 210 Minn. 462, 299 N. W. 16.

[19]Heitman v. City of Lake City, 225 Minn. 117, 30 N. W. (2d) 18.

[20]14 Dunnell, Dig. (3 ed.) § 7165.