Terry S. KAISER–BAUER, Respondent,

v.

John C. MULLAN, M.D.,
et al., Appellants.

No. C3–99–1396.

Court of Appeals of Minnesota.

May 2, 2000.

Joseph R. Klein, Moss & Barnett, P.A., Minneapolis, for respondent.

William H. Leary III, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for appellants.

Considered and decided by DAVIES, Presiding Judge, LANSING, Judge, and HARTEN, Judge.

## OPINION

LANSING, Judge

Terry Kaiser–Bauer brought a medical-malpractice action against John Mullan, alleging negligence in the performance of carpal-tunnel surgery and the administration of post-operative care. The jury returned a special verdict in Kaiser–Bauer's favor and awarded her approximately $132,000 in damages. Because the trial judge improperly submitted two of Kaiser–Bauer's three negligence theories to the jury and the evidence does not conclusively establish that Kaiser–Bauer is entitled to the verdict on the third theory, we reverse the jury's verdict and remand for a new trial.

## FACTS

In September 1995, Terry Kaiser–Bauer's neurologist referred her to John Mullan, a neurosurgeon, because of progressively worsening symptoms of numbness, tingling, and muscle fatigue in her right hand. After examining Kaiser–Bauer in October 1995, Mullan concluded that she had developed carpal-tunnel syndrome and recommended surgery.

Carpal-tunnel surgery is performed to decompress the median nerve by dividing the transverse carpal ligament. Injury to the median nerve and its accessory nerves, including the recurrent motor branch, is a recognized risk of surgery. Mullan informed Kaiser–Bauer of the risk before performing the surgery on October 13, 1995.

Mullan saw Kaiser–Bauer in his office three times after the surgery. When he

last saw her on January 10, 1996, he had learned from Kaiser–Bauer's physical therapist's report that Kaiser–Bauer's abductor pollicis brevis and opponens pollicis, the muscles that move the thumb, were weak. He had also learned that the weakness in the muscles was impairing Kaiser–Bauer's coordination and her ability to hold a pen, and that Kaiser–Bauer had complained that her "hand and fingers [did not] bend right." Mullan examined Kaiser–Bauer, found the hand's range of motion and pinching strength to be normal, and discharged her from care. His discharge notes indicate that Kaiser–Bauer "appeared to be doing quite well" and there was "no need for [a] follow-up visit."

In February 1996, several weeks after Kaiser–Bauer last saw Mullan, she noticed that her right palm was flat and gray. On her physical therapist's recommendation, Kaiser–Bauer consulted Jeffrey Groner, a neurosurgeon who specialized in the hand.

Groner first saw Kaiser–Bauer in March 1996. He did some neurological testing and determined that, although the hand's range of motion was normal, there was a problem with the innervation of the hand. Groner saw Kaiser–Bauer again on April 16 and determined that he could not diagnose Kaiser–Bauer's condition with certainty based on the physical evidence alone. He therefore referred her to Frank Wei for electrodiagnostic testing, including an electromyogram (EMG).

The EMG results indicated that the recurrent motor branch of the median nerve had been cut. Groner speculated that scar tissue had developed around the nerve after it was cut, but could not be sure. He therefore recommended a second opinion, and Kaiser–Bauer contacted Karen Porth, a neurologist. Porth concluded there was some ongoing compression or irritation of the nerve and recommended exploratory surgery to determine the source.

Groner performed the surgery in July 1996. He found the recurrent motor branch of the median nerve encased in significant scar tissue. After removing the scar tissue, Groner saw that the nerve had been sharply cut. When he looked at the nerve closely, he saw scar tissue between the two severed ends. He also saw that one end of the nerve was twice the diameter of the other end. The presence of scar tissue and the difference in the nerve endings' sizes suggested the injury to the nerve had occurred "some months beforehand." A test Groner conducted with a nerve stimulator confirmed that the injury was at least 48 to 72 hours old. Based on these observations, Groner concluded Mullan had divided the recurrent motor branch during surgery.

In September 1997, Kaiser–Bauer brought this medical-malpractice action, claiming Mullan had negligently injured the recurrent motor branch of the median nerve during surgery. Kaiser–Bauer asserted three liability theories.

### a. The Tourniquet Theory

Kaiser–Bauer's first liability theory was that Mullan departed from the generally accepted standard of care by failing to use a tourniquet to constrict the flow of blood. At trial, Wayne Thompson, an orthopedic surgeon who served as Kaiser–Bauer's expert, testified that, although the flow of blood can be constricted with vasoconstrictors and electrocautery, Mullan departed from generally accepted standards by failing to use a tourniquet. Mullan admitted he did not use a tourniquet, but claimed that neurosurgeons are trained to constrict the flow of blood with vasoconstrictors and electrocautery rather than tourniquets. Scott McPherson, a hand-surgery specialist, confirmed Mullan's testimony and added that the use of a tourniquet during carpal tunnel surgery is a matter of surgical preference. He also stated that he searched the medical literature and found no articles suggesting that the use of vasoconstrictors and electrocautery in carpal-tunnel surgery is inappropriate or that the use of the tourniquet is safer. On the contrary, the medical literature introduced at trial suggested that vasoconstrictors and electrocautery may be used safely in

the performance of carpal tunnel surgery and are preferable to the tourniquet. No witness testified that Mullan's operative field was bloody, and Kaiser–Bauer presented no nontestimonial evidence to support this theory.

*b. The Inspection Theory*

Kaiser–Bauer's second liability theory was that Mullan departed from the accepted standard of care by failing to inspect the recurrent motor branch of the median nerve to determine if it had been cut during surgery. Thompson testified that all carpal-tunnel surgeons, regardless of specialty, are required to inspect the recurrent motor branch before concluding the surgery. According to Thompson, the timely realization that the nerve had been cut would have allowed Mullan to repair the nerve promptly and thereby minimize long-term damage.

Mullan admitted he did not inspect the recurrent motor branch. He testified, however, that neurosurgeons are trained not to locate the motor branch unless there is reason to believe it has been injured. McPherson confirmed Mullan's testimony and added that looking for the motor branch when there is no reason to believe it has been injured was bad practice. Neither Mullan nor McPherson disputed that the timely realization that the nerve had been cut would have minimized the damage resulting from the transection.

*c. Muscle-testing Theory*

Kaiser–Bauer's last liability theory was that Mullan departed from the accepted standard of care by failing either to conduct opponens testing during postoperative care or to conduct it properly. Opponens testing involves the clinical assessment of the function of the opponens pollicis, a thumb muscle. According to Thompson, had Mullan properly conducted opponens testing, he would have discovered that Kaiser–Bauer's abductor pollicis brevis and opponens pollicis were weak. Muscle weakness would have necessarily suggested nerve damage and resulted in early repair.

Relying on notes from his last visit with Kaiser–Bauer, Mullan testified that he conducted the test and that Kaiser–Bauer's range of motion was normal. Groner, who tested Kaiser–Bauer several weeks after Mullan tested her, also found Kaiser–Bauer's range of motion and thumb function to be "within normal limits" and concluded that "there appeared to be no appreciable impairment."

At the conclusion of the evidence, Mullan moved for a directed verdict, claiming the evidence was insufficient to sustain a verdict on any of Kaiser–Bauer's negligence theories. Kaiser–Bauer opposed the motion, arguing that she had established a prima facie case on the inspection theory. The trial judge denied Mullan's motion without comment and submitted the case to the jury.

The jury returned a four-question special verdict in Kaiser–Bauer's favor, finding Mullan negligent. The trial judge subsequently denied Mullan's motion for judgment notwithstanding the verdict (JNOV) or a new trial, reasoning that "the record contained competent evidence reasonably tending to sustain the verdict." The court noted that because the jury was asked generally whether Mullan was "negligent in failing to meet recognized medical standards in the treatment and care of Terry Kaiser–Bauer," the court could grant or deny JNOV on the entire cause of action, but not on the liability theories individually. This appeal followed.

## ISSUES

I. Did the trial court err in denying Mullan a directed verdict on Kaiser–Bauer's tourniquet and muscle-testing liability theories?

II. Does the trial court's failure to direct a verdict on Kaiser–Bauer's non-viable liability theories require judgment notwithstanding the evidence on those theories and a new trial on the remaining viable theory?

## ANALYSIS

We review de novo the denial of a motion for judgment notwithstanding the

verdict. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn.1998). In this review, our limited role is to determine whether the record contains any competent evidence reasonably tending to sustain the verdict. *Id.* We consider the evidence in the light most favorable to the verdict and will affirm unless the evidence is "practically conclusive against the verdict." *Id.* (quotation omitted). We will similarly affirm the denial of a motion for a new trial unless the verdict is "manifestly and palpably contrary to the evidence, viewed in a light most favorable to the verdict." *ZumBerge v. Northern States Power Co.*, 481 N.W.2d 103, 110 (Minn. App.1992), *review denied* (Minn. Apr. 29, 1992).

**I**

A trial court may grant a directed verdict when the evidence is insufficient as a matter of law to present a fact question for the jury. *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 405 (Minn.1998). This court reviews de novo the trial court's ruling on a directed verdict. *Overocker v. Solie*, 597 N.W.2d 579, 581 (Minn.App.1999).

To establish a prima facie medical-malpractice case and avoid a directed verdict, a plaintiff must establish (a) the standard of care recognized by the medical community as applicable to the defendant, (b) that the defendant departed from that standard, (c) that the defendant's departure from the standard directly caused the plaintiff's injuries, and (d) damages. *Reinhardt v. Colton*, 337 N.W.2d 88, 94 (Minn. 1983). Because Kaiser–Bauer failed to establish a prima facie case on the tourniquet and muscle-testing theories, the trial court erred in not directing a verdict on those theories.

*a. The tourniquet theory*

In medical-malpractice cases, the standard of care is a fact question for the jury. *Lane by Lane v. Skyline Family Med. Ctr.*, 363 N.W.2d 318, 324 (Minn.App. 1985). The record in this case contained conflicting evidence on whether the generally accepted standard of care required the use of a tourniquet in the performance of carpal-tunnel surgery. Thompson testified that, although the flow of blood can be constricted by the use of vasoconstrictors and electrocautery, generally accepted standards require the use of the tourniquet in the performance of hand surgery. Mullan, on the other hand, testified that neurosurgeons are trained to use vasoconstrictors and electrocautery to control bleeding and that both methods had been shown to be a safe, effective, and efficient alternative to the tourniquet. Given the conflict in the evidence, the jury could reasonably have found that Mullan departed from the standard of care by failing to use a tourniquet.

But because the record contains no testimony or evidence that Mullan's operative field was bloody, the jury could not reasonably have found that his failure to use a tourniquet proximately caused Kaiser–Bauer's injuries. The trial court therefore erred in submitting the tourniquet theory to the jury. *See Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 762 (Minn. 1998) (stating expert opinion is required to prove causation if issue is outside realm of common knowledge); *Smith v. Knowles*, 281 N.W.2d 653, 656 (Minn.1979) (holding the lack of expert testimony that doctor's departure from standard of care caused plaintiff's injury justified directed verdict).

*b. The muscle-testing theory*

The court also erred in submitting the muscle-testing theory to the jury. Although the evidence presented a fact question for the jury on whether Mullan breached the generally accepted standard of care by failing to conduct opponens testing or by conducting it improperly, Kaiser–Bauer failed to raise a fact ques-

tion on whether Mullan's failure to conduct opponens testing proximately caused Kaiser–Bauer's injuries. Thompson testified that if Mullan had conducted opponens testing properly, he necessarily would have discovered muscle weakness and either determined that there was nerve impairment or ordered further testing. The nerve would have been repaired sooner and the results would have been optimal because the earlier the repair, the better the results.

 But the record does not support Thompson's assertion that had Mullan conducted opponens testing properly he would have discovered muscle weakness and thereby realized that the recurrent motor branch had been cut. In fact, the record directly contradicts that assertion because Groner conducted opponens testing on Kaiser–Bauer only a few weeks after her last visit with Mullan and, like Mullan, found no significant impairment in muscle function. An inference of causation may not be based on conjecture, speculation, or mere possibility. *Bernloehr v. Central Livestock Order Buying Co.*, 296 Minn. 222, 224, 208 N.W.2d 753, 755 (1973). Thompson's bare assertion that proper testing would have shown weakness of the abductor pollicis brevis and necessarily would have suggested nerve injury was based on conjecture. His testimony lacked the factual foundation necessary to support an inference that Mullan's alleged failure to do opponens testing caused Kaiser–Bauer damage. Because Kaiser–Bauer did not establish a reasonable probability that Mullan's negligence proximately caused her injuries, the trial court erred in submitting the muscle-testing theory of liability to the jury.

Having concluded that the trial court erred in not directing a verdict in Mullan's favor on the tourniquet and muscle-testing theories, we turn to whether the trial court's error requires JNOV on those the-ories and a new trial on the inspection theory.

## II

 Under Minnesota law, when the trial court erroneously submits one or more negligence theories to the jury and the jury returns a general verdict for plaintiff, defendant is entitled to judgment notwithstanding the verdict and a new trial, unless it conclusively appears as a matter of law that the verdict is justified on one or more of the properly submitted theories or on other grounds. *Schroht v. Voll*, 245 Minn. 114, 118, 71 N.W.2d 843, 846 (1955); *Ohrmann v. Chicago & N.W. Ry. Co.*, 223 Minn. 580, 585, 27 N.W.2d 806, 809 (1947). The supreme court has applied the same rule and reasoning in non-negligence cases. *See, e.g., Esbjornsson v. Buffalo Ins. Co.*, 252 Minn. 269, 276, 89 N.W.2d 893, 898 (1958) (setting aside general verdict in favor of insurer in breach-of-contract action and remanding for new trial when issue of insurable interest was improperly submitted to the jury and evidence was conflicting on issue of arson). When the special verdict separates the liability theories, a reviewing court can determine whether a jury's finding of liability is on a properly submitted theory. But the law requires a new trial when it is impossible to determine whether the jury based its verdict on a theory properly submitted to the jury or one not properly submitted. *Schroht*, 245 Minn. at 118, 71 N.W.2d at 846.

 Kaiser–Bauer does not challenge the *Schroht* rule. Instead, she argues that the rule applies only in cases involving a general verdict. But the supreme court has also relied on the *Schroht* rule in analyzing special-verdict cases. *See Gilbert v. Brindle*, 306 Minn. 569, 570–71, 237 N.W.2d 83, 84–85 (1975) (stating new trial is required "if evidentiary support as to any one of the theories submitted is lacking" and affirm-

ing denial of JNOV and new trial on ground that "reasonable inferences of negligence, on any of the several theories of liability submitted to the jury, could be drawn from the circumstantial evidence"); *Peterson v. Rodekuhr*, 274 Minn. 204, 207 n. 2, 209, 143 N.W.2d 226, 229 n. 2, 230 (1966) (affirming denial of new trial on ground that evidence was sufficient to justify submission of all liability theories to the jury).

■ Alternatively, Kaiser–Bauer claims that Mullan waived his right to raise the new-trial issue on appeal by failing to object to the form of the special verdict. She argues that "[w]here no objection is made prior to the submission of the matter to the jury, any argument based upon the form of the special verdict is considered to be waived." But Mullan does not base his argument on the form of the special verdict. He bases it on the trial court's erroneous submission of one or more liability theories to the jury, which raises a question of law.

■ To preserve a substantive issue for appeal, a party is required only to raise the issue at trial and make the appropriate post-trial motions. *See Sauter v. Wasemiller*, 389 N.W.2d 200, 201–02 (Minn.1986) (ruling new-trial motion required to preserve for appellate review issues arising at trial); *Kitchar v. Kitchar*, 553 N.W.2d 97, 102 (Minn.App.1996) (stating error first argued on appeal and not basis of new-trial motion or otherwise presented to trial court may not be considered on appeal), *review denied* (Minn. Oct. 29, 1996). We can find no authority for the proposition that a party who fails to object to the form of verdict waives the right to seek review of a substantive issue unrelated to the verdict form. On the contrary, Minnesota Rule of Civil Procedure 49 and cases interpreting it suggest that by not objecting, a party waives only challenges to the form of the verdict and the right to a jury trial on

issues not submitted to the jury. *See* Minn. R. Civ. P. 49; *Thielbar v. Juenke*, 291 Minn. 129, 136, 189 N.W.2d 493, 497 (1971) (suggesting failure to object to form of special verdict constitutes waiver of any objection party may have to form of verdict); *Larson v. Degner*, 248 Minn. 59, 65–66, 78 N.W.2d 333, 338 (1956) (holding that, by failing to propose additional questions for submission, party waived right to jury trial on issues not submitted to jury on special verdict). By moving for a directed verdict at trial and making the appropriate post-trial motions, Mullan thus properly preserved the new-trial issue.

■ Because we conclude that the *Schroht* rule applies to this case, we hold that Mullan is entitled to JNOV on the tourniquet and muscle-testing theories, which the trial court erroneously submitted to the jury. We must next consider whether Kaiser–Bauer is entitled to the jury's verdict on the inspection theory of liability as a matter of law. We conclude that she is not. The evidence introduced in connection with the inspection theory was conflicting, at least with respect to the appropriate standard of care. Thompson, an orthopedic surgeon, testified that the accepted standard of care for all physicians performing carpal-tunnel surgery, regardless of specialty, requires them to visualize the recurrent motor branch of the median nerve before cutting the transverse carpal ligament and to inspect it before concluding the surgery to ensure that it was not severed. Mullan and McPherson, on the other hand, testified that neurosurgeons are trained not to look for the recurrent motor branch after cutting the transverse carpal ligament unless there is reason to believe that the nerve has been injured. McPherson added it would be bad practice to look for the nerve because of the risk of injury associated with the search.

Because the evidence on the applicable standard of care was conflicting, we cannot

conclude as a matter of law that Mullan violated the standard of care by failing to find and inspect the nerve before concluding the surgery. The evidence presents a question of fact that the jury could reasonably have decided either way. As a result, Mullan is entitled to a new trial on the inspection theory of liability.

## DECISION

The trial court erred in submitting the tourniquet and muscle-testing liability theories to the jury, and Mullan is therefore entitled to judgment notwithstanding the verdict on those theories. Because the evidence does not establish as a matter of law that Kaiser–Bauer is entitled to the verdict on the inspection theory of liability, we remand for a new trial on that theory.

**Reversed and remanded.**